Argued and submitted March 30, 1998, reversed January 20, petition for review
allowed May 25, 1999 (328 Or 594)
See later issue Oregon Reports

Dorothy NORDEN,
*Respondent,*

*v.*

STATE OF OREGON,
acting by and through its
WATER RESOURCES DEPARTMENT;
and Tony Justus, Umatilla County Watermaster,
*Appellants,*

*and*

UMATILLA COUNTY,
a political subdivision of the State of Oregon,
*Defendant.*

(CV 95-0002; CA A93331)

973 P2d 910

Richard D. Wasserman, Assistant Attorney General, argued the cause for appellants. With him on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

George W. Kelly argued the cause and filed the brief for respondent.

Before Landau, Presiding Judge, and Deits, Chief Judge,* and Wollheim, Judge.

LANDAU, P. J.

---

* Deits, C. J., *vice* Riggs, J., resigned.

## LANDAU, P. J.

The Water Resources Department (department) issued an order requiring petitioner Norden to obtain a water rights permit to use water from a spring on her property. The principal basis for the order was the department's finding that the water from the spring, if not diverted, would run off Norden's property, thereby triggering the need for a permit. Norden sought judicial review of the department's order, contending that the department erred in finding that the water would run off of her property if not diverted. After hearing the evidence, the trial court concluded that Norden was correct and reversed the department's order, declared that Norden is entitled to use the water from the spring without first obtaining a water rights permit, and awarded her attorney fees. The department appeals, assigning error to the trial court's decision on the merits and to its award of attorney fees. We review to determine whether substantial evidence supports the department's findings. We conclude that the department's findings are supported by substantial evidence and reverse the trial court.

Norden owns land in Umatilla County that borders McKay Creek. A spring on the property flows down a rock-lined channel until part of it is diverted into an irrigation ditch and part is diverted into a pond. There is an older, unlined channel that runs from the two diversions towards McKay Creek. That channel is referred to as the "old channel." Where the old channel reaches McKay Creek, there is a gravel dike to prevent flooding. For ease of reference, we provide a map of the area, not drawn to scale.

In 1994, Tony Justus, a watermaster for the department, investigated the Norden property. Based on his observations, he concluded that water flows from the spring down the rock-lined channel that, if not for the diversions, the water would continue to flow into McKay Creek and eventually into the Umatilla River. Justus issued an order, dated November 14, 1994, informing Norden that she is not entitled to divert the water from the spring without first obtaining a water rights permit, because, under Oregon law, a landowner is entitled to use water without a permit only if the water would not flow off the property if undiverted.

Norden petitioned for judicial review of the November 14, 1994, order in circuit court as an order in other than a contested case. ORS 183.484.[1] Both Norden and the department submitted evidence as to the nature of the property and the water flow from the spring on her property.

Norden testified that, when she bought the property in 1973, the water flowed through the channel to the pond but not into the creek. She testified that she believed that, if there were no irrigation ditch for the water to run through, the water would puddle and soak into the ground rather than run in a natural course to the creek.

William Porfily was the watermaster for Umatilla County from 1973 to 1979 and testified on Norden's behalf after visiting the property. He studied a 1910 adjudication map that does not show a spring discharging into the creek from Norden's property.

James Graham is an independent hydrogeologist who conducted a geological and hydrological study of Norden's spring. He noted that the 1910 map did not show the spring discharging into the creek but hypothesized that perhaps the water from the spring already was diverted at that time. He also observed that the land is very porous and water left to flow naturally would be absorbed.

---

[1] The petition named as defendants the department, Justus, and Umatilla County. By stipulation, Umatilla County was dismissed as a party. Justus was named only in his capacity as watermaster for the department. Accordingly, we refer to defendants collectively as "the department."

Max Chaney testified for the department. He was born in 1913 and lived on the property from that point until the mid-1960s. He testified that his father moved the flow of the creek to be further from the house and that the channel, including the segment referred to as the old channel, is where the creek used to run. He remembered that the water from the spring flowed down the channel and into the creek. The family built a wheel house to pump water from the channel and to generate electricity for the house.

Tony Justus testified for the department in his capacity as watermaster for the district covering Norden's property. He testified that he had visited the property several times before and after the order. On one occasion, he observed and photographed water that had overflowed from the irrigation ditch beyond the point of diversion. That water traveled in the old channel down to the dike next to the creek. He concluded from his studies and observations of the property that, but for the diversion ditch and the dike, the spring water would flow into the creek. He opined that the old channel could be a natural channel enhanced by a rock lining and stated that it is a well-defined channel. He measured the stream flow above the diversion point on August 15, 1994, at three-quarters cfs, or 337 gallons per minute. He measured again in the same area on July 17, 1995, for a reading of one and one-quarter cfs, or 561 gallons per minute, enough water to irrigate about 100 acres.

Justus's supervisor, Mike Ladd, is a regional manager for the department. He testified that he read and approved the November 14, 1994, order before its issuance. He testified that, as he flew above the property in 1991, he was surprised by the large pond and inquired about it to people in the regional office. He learned that Justus thought Norden needed a water rights permit, but that the then-watermaster, Mr. Debow, and a less experienced person in the office, Mr. Squibb, disagreed. Ladd testified that Debow and Squibb did not consider all of the factors that Justus had considered in evaluating the matter. The issue was not raised again until 1994, when Justus was the watermaster and undertook further investigation. He stated that Justus complied with applicable standards in taking the measurements.

Ladd personally visited the property with Justus and examined the maps and aerial photographs. He said that he concurred in the conclusion that the water would reach the creek if allowed to flow naturally and that it would not puddle.

Thomas Paul is the department's supervisor of all regions. He visited the property and took elevations. He said that the ground was saturated and would not absorb water. He suggested that the channel is an improved natural channel and noted that his elevation measurements indicated that the old channel's path is the low point of the land where water would collect naturally. He further testified that, even if the improved channel were filled in, the water from the spring would form another channel and flow to the creek. In examining a 1960 aerial photograph, he detected substantial water flowing down the old channel and entering the creek. He visited the property on January 25, 1995, and observed the following:

> "I tried to walk across it close to what we're calling the natural channel with the majority of the flow, and the water is deep and it's flowing. It's marshy, but it's still flowing."

On July 17, 1995, he saw water standing in the old channel, but did not see any flowing water, and hypothesized that the water came from the ground. He stated that the water in the old channel at both times was not enough to flow down to the dike. He concluded that the water would reach the creek if not diverted.

Barry Norris, who testified in his capacity as an engineer for the department, visited the site and reviewed Graham's report. When he visited the site he observed dampness, but no standing water in the old channel. Regarding his observations in contrast to the conclusions in Graham's report, he stated:

> "Well, the report would lead you to believe that the spring water that is on the [Norden] property as well as creek property left to its own devices would simply sink into the ground and disappear. And we already know that the spring water is arising both on the Norden property and the Burton property in an area where it doesn't sink into the ground and simply disappear.

"It runs from that area northerly along a channel and then it winds to the west and through the improved property, where the house and lawn are, where it's not sinking into the ground and disappearing. And it reaches the diversion point just below the outhouse. And in that length we know that it is not sinking and disappearing.

"It's then—somebody's gone to a lot of work, Ms. Norden, to divert that flow either to the north and to what they call I guess the north field where she's irrigating with it. And it does disappear into the ground.

"Or they could divert it to the south through a channel, through a ditch, into the pond. And the pond is only—the westerly edge of the pond is probably only 30 feet or so from McKay Creek. And it's not disappearing into the ground through the reservoir area in the pond. So we know there's a large part of the property where it doesn't just simply flow into the ground and disappear.

"If the westerly side of the pond were removed, the flow would then flow through the ditch, into the pond area, and then back into McKay Creek. Another fact is that from that diversion point westerly out to McKay Creek there's an existing channel. Left to its own devices, the spring water, just based on observation, would flow in that channel and return back to McKay Creek on its own."

He concluded that even if the channel were filled in and leveled out, the water would run the course of the old channel and reach the creek.

Following the submission of the evidence, the trial court issued findings of fact and conclusions of law. The trial court found, among other things, that the spring that arises on Norden's property would not flow off of her land naturally. According to the trial court, even without the diversions, "the spring water would puddle up on [Norden's] property, create a swampy area, and not flow off." The court then concluded that the department's November 14, 1994, order was not supported by substantial evidence. It entered a judgment reversing the order, declaring that Norden has the right to use the disputed water without first obtaining a water rights permit, and awarding Norden attorney fees.

On appeal, the department asserts that the trial court erred in concluding that the findings in the department's November 14, 1994, order concerning the flow of water from the spring on Norden's property were not supported by substantial evidence. According to the department, there is ample evidence in the trial record to support the department's findings, and the trial court apparently engaged in its own weighing of the evidence at trial instead of determining whether the department's findings were reasonable.

Norden offers two arguments in support of the trial court's decision. First, she contends that the evidence adduced at trial cannot be considered in evaluating the findings at issue; only the evidence that existed at the time of the November 14, 1994, order is relevant to determining whether the department's findings survive the statutory substantial evidence standard of review. In light of the limited facts available to the department at the time of its order, Norden argues, the trial court was correct in concluding that the department's findings were not supported by substantial evidence. Second, Norden argues, even if the evidence at trial is taken into account, the trial court was correct.

■■ We begin with the preliminary issue of our scope of review, that is, the extent to which the record before us includes the evidence admitted at trial or merely those facts known to the department at the time of its final order. In *Burke v. Children's Services Division*, 288 Or 533, 544, 607 P2d 141 (1980), the Supreme Court stated that "[r]eview of orders other than in contested cases originates in the circuit court and the record is made there." To be sure, the statement was *dictum*. But, unless clearly incorrect, we generally do not disregard such statements, even if they were not necessary to the holding of the particular decision in which they appear. *See, e.g., Turczynski v. Grill*, 134 Or App 351, 355 n 5, 895 P2d 787 (1995). In this case, the court's statement is not clearly incorrect. To the contrary, it is eminently correct.

■ The Oregon Administrative Procedure Act provides for judicial review of orders issued in "contested cases," ORS 183.482, and orders issued in "other than contested cases,"

ORS 183.484. In contested cases, an evidentiary record is made before the administrative agency, and the agency is generally forbidden to consider any factual information outside of that record. ORS 183.450(2). Judicial review of orders issued in contested cases is accomplished by this court. ORS 183.482(1). Ordinarily not a record-making court, this court is confined—subject to limited exceptions—to the record made before the agency. ORS 183.482(7). In contrast, in "other than contested cases," the agency is not required to make its decision on the basis of a record developed before decision. ORS 183.310(2)(a)(D). Because of that fact, judicial review of orders issued in such cases is taken to the circuit courts, which are record-making courts and which are not statutorily limited to review on the record before the agency at the time of the agency decision. ORS 183.484. Thus, the evident purpose of requiring petitions for judicial review of orders in other than contested cases to be heard by circuit courts—as opposed to appellate courts—is to enable the circuit courts to develop an evidentiary record against which to evaluate the agency's decision.

Although we have never explicitly said as much, that is, in fact, precisely how we have construed the relevant provisions of the statutes pertaining to judicial review of orders in other than contested cases. In *Keeton-King Construction v. State of Oregon*, 105 Or App 41, 44-45, 802 P2d 711 (1990), *modified on other grounds* 106 Or App 663, 809 P2d 708 (1991), for example, we referred to testimony admitted at trial in explaining why the trial court erred in concluding that the agency findings at issue were not supported by substantial evidence. More recently, in *Ellis v. Dept. of Education*, 157 Or App 92, 99-101, 967 P2d 912 (1998), we similarly referred to testimony admitted at trial in support of our conclusion that the agency's findings were supported by substantial evidence. We therefore reject Norden's contention that we may not consider the evidence produced at trial in addressing the issues before us on appeal.

We turn, then, to the merits of the department's assignment of error. When a circuit court reviews factual findings in an order issued in other than a contested case, it is required to determine whether the agency's findings are

supported by substantial evidence. ORS 183.484(4). Substantial evidence exists "when the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.484(4)(c). When we review the circuit court's decision in that regard, we determine whether the court correctly applied the substantial evidence standard of review. *Harris v. Board of Higher Education,* 145 Or App 477, 478, 930 P2d 873 (1996). In practical effect, that means we review the agency's order itself to determine whether the findings in it are supported by substantial evidence. *Id.*

■    The statutory context for the findings at issue in this case is as follows. ORS 537.110 provides that "[a]ll water within the state from all sources of water supply belongs to the public." ORS 537.130(2) further provides that, subject to exceptions not pertinent to this case, "no person shall use, store or divert any waters until after the department issues a permit to appropriate the waters." ORS 537.800 specifically applies the permit requirement to the use of spring waters:

> "(1)    All ditches now or hereafter constructed, for the purpose of utilizing waste, spring or seepage waters, shall be governed by the same laws relating to priority of right as those ditches constructed for the purpose of utilizing the waters of running streams. However, the person upon whose lands the seepage or spring waters first arise shall have the right to the use of such waters.

> "(2)    As used in this section, 'spring' means a point where water emerges naturally from the earth as a result of gravity flow or artesian pressure."

Since 1906, however, the courts consistently have construed ORS 537.800 and its predecessor statutes to require a permit only if the spring produces sufficient water to flow, undiverted, off of the land on which it arises, either onto the property of another or into another watercourse. *Morrison v. Officer,* 48 Or 569, 570, 87 P 896 (1906) (when the spring produces a quantity of water "so insignificant that a surface stream is impossible * * * the use of the water belongs to the person upon whose land it first arises"); *see also Beisell et ux. v. Wood et ux.,* 182 Or 66, 71, 185 P2d 570 (1947) (spring water that "merely seeps or flows directly into a small marsh upon the same tract, having no perceptible outlet * * * is not

subject to appropriation by any person other than the owner of such land"); *Klamath Development Co. v. Lewis*, 136 Or 445, 450, 299 P 705 (1931) (spring water that "would not flow in any channel or to or upon adjacent property * * * is not subject to appropriation by a person other than the owner of the land").

In this case, the department found that, but for the diversion ditch and the dike, the water from the spring on Norden's property would flow into McKay Creek. There is testimony on both sides of the matter. Chaney testified that he remembered from his childhood that the spring water did reach the creek. Norden testified that it did not. Justus testified that he observed water overflowing from the diversion ditch and reaching the dike through the old channel. Moreover, he measured the stream flow before diversion at 561 gallons per minute, which he regarded as more than adequate to reach the creek. Porfily testified that, based on the 1910 adjudication map and his own measurements, the flow from the spring would not be adequate to reach the creek. So also did Graham, who said that the ground was porous and absorbent. Paul, on the other hand, testified that the ground was saturated and would not absorb water and that, based on his observations and a later aerial photo of the area, the spring water would reach the creek if undiverted. Norris similarly testified that the spring water would not puddle due to high ground water and that the water would flow off of the land if not diverted. In light of such conflicting testimony, we cannot say that the department lacked substantial evidence to support its finding that the spring water would flow off of Norden's land.

Norden insists that there is less to the department's supporting testimony than meets the eye, because the opinions of all of the department's witnesses depended upon the existence of the man-made, rock-lined channel to route the flow of the spring water to McKay Creek. According to Norden, the law requires a permit only if the water *naturally* would flow off of the property. We need not determine whether Norden is correct that only natural flow—unaided by an artificial channel—suffices to trigger the application of the permit requirement. In this case, there is testimony that,

in fact, the rock-lined channel is an improved natural channel and that, in any event, even if the channel were entirely filled in, the spring flowed in sufficient quantity and the ground was sufficiently saturated that the water would—one way or the other—make its way to the creek.

We conclude that the trial court erred in concluding that the department's findings were not supported by substantial evidence and in reversing the November 14, 1994, final order. Having arrived at that conclusion, we need not address the department's other assignments of error.

Reversed.