# AIKEN et vir, *Petitioners,*
## *v.*
# LIEUALLEN et al, *Respondents.*
## (CA 11083)
### 593 P2d 1243

Matthew W. Chapman, Portland, argued the cause for petitioners, with him on the brief was Joyce H. Benjamin, Eugene.

Mary J. Deits, Assistant Attorney General, Salem, argued the cause for respondents. With her on the brief were James A. Redden, Attorney General, Walter L. Barrie, Solicitor General, and Marcus K. Ward, Assistant Attorney General, Salem.

Before Schwab, Chief Judge, and Thornton and Gillette, Judges.

GILLETTE, J.

**GILLETTE, J.**

Petitioners' filed a complaint in March, 1977, alleging that four areas of the University of Oregon's intercollegiate athletic program were in violation of ORS 659.150, which prohibits discrimination on the basis of sex in state-financed educational programs. The petitioners claimed standing as Oregon taxpayers and because, at the time the complaint was filed, two of their daughters were participants in the University's women's varsity basketball program. A contested case hearing was held on October 17, 1977, from which the hearings officer determined that the University was in violation of ORS 659.150. Her findings and recommendations were issued in March, 1978, and submitted to the Oregon Chancellor of Higher Education for review and entry of an order. The Chancellor reversed the hearings officer and found that the University was not in violation of ORS 659.150. Petitioners appeal from the final order issued by the Chancellor. For the reasons set out below, we reverse the Chancellor's order and remand for further proceedings.

The framework for consideration of the issue of sex discrimination is provided by ORS 659.150(2), which states in relevant part:

> "No person in Oregon shall be subjected to discrimination * * * in any higher education program or service, school or interschool activity where the program, service, school or activity is financed in whole or in part by moneys appropriated by the Legislative Assembly."

"Discrimination" is defined in subsection (1) as:

> "* * * any act that *unreasonably differentiates* treatment, intended or unintended, or any act that is fair in form but discriminatory in operation, either of which is based on age, handicap, national origin, race, marital status, religion or sex." (Emphasis added)

These provisions were enacted in Ch 204, 1975 Oregon Laws, effective May 18, 1975. Pursuant to Chapter

204, the State Board of Higher Education issued regulations, certain provisions of which are addressed specifically to athletics. The key provision, OAR 580-35.032(2), provides in part:

> "In assessing the totality of athletic opportunity provided, institutions shall be guided by regulations implementing Title IX of the Educational Amendments of 1972, and shall assess at least the following:
>
> "a. Appropriateness of equipment and supplies.
>
> "b. Games and practice schedules.
>
> "c. Travel and per diem allowances.
>
> "d. Opportunity for coaching and academic tutoring.
>
> "e. Coaches and tutors.
>
> "f. Locker rooms, practice and competitive facilities.
>
> "g. Medical and training services.
>
> "h. Housing and dining facilities and services.
>
> "i. Publicity.
>
> "Athletic expenditures need not be equal but the pattern of expenditures must not result in a disparate effect on opportunity. Institutions may not discriminate in the provision of necessary equipment, supplies, facilities, and publicity for sports programs."

In addition, regulations not specifically limited to athletics prohibit discrimination in recruiting of students (OAR 580-35.021(1)), in providing "aid, benefit or services to students" (580-35.022(2)), and in employment assistance (580-35.029(1)). Section 580-35.028(4), concerning athletic scholarships, requires institutions awarding such scholarships to ensure that "reasonable opportunity exists for members of each sex to participate in intercollegiate athletics."

The Oregon regulations were modeled closely after the federal regulations implementing Title IX of the Educational Amendments of 1972, 20 USC §1681. The Title IX regulations are different, however, in that they provide for specified transition periods, allotting one year for institutions to conduct a self-evaluation study, two additional years for compliance, and setting

[782]

the deadline for compliance at July 21, 1978. The Oregon regulations make no mention of a compliance schedule.

Petitioners' complaint identified four specific areas under OAR 580-35.032 in which they alleged an unreasonable disparity existed in the treatment of the men's and women's basketball teams. The specific charges were directed at the transportation, officiating and coaching provided to the women's teams and to the University's alleged lack of commitment to a strong, competitive athletic program for women as indicated by the personnel hired to carry out the program. The University responded with a summary report of its efforts toward compliance with Title IX[1] and the federal goal of "equal opportunity" in athletics. Petitioners were dissatisfied with the response and requested a hearing pursuant to OAR 580-35.040.[2]

Petitioners' evidence at the October, 1975, hearing consisted primarily of evidence of the University's budget and expenditures for both the men's and

---

[1] Notwithstanding the fact that petitioners' complaint was addressed to alleged claims under chapter 204, Or Laws 1975, and its accompanying regulations, the University's summary report detailed the University's efforts towards compliance with the federal requirements under Title IX and the federal regulations.

[2] OAR 580-35.040 provides:

*Appeal to the Chancellor*

"1. Whenever, in the judgment of the Chancellor, an institution or agency fails to conduct a satisfactory investigation, fails to take appropriate corrective action or fails to make reports on complaints within the 30-day period where no extension has been granted or within the period allowed under the extension, the Chancellor shall initiate his own investigation of the complaint.

"2. Whenever the complainant is not satisfied with the report, or no report is made within the time allotted, the complainant may request in writing that a hearing on the complaint be held. The request shall state the grounds upon which the complainant deems the report is unsatisfactory. The request shall be filed with the compliance officer who shall forward a copy promptly to the Chancellor. Upon receipt of the request, the Chancellor may order the hearing; provided, however, that the Chancellor may review the report and other information presented to him and may then, in his discretion order that no hearing be held and declare that the action of the institution is satisfactory. The Chancellor's order shall be final."

women's programs in the nine areas set out in OAR 580-35.032(2), and the University's policies regarding officiating in the men's and women's programs. Oddly enough, however, petitioners did not elicit testimony from any of the University's women athletes concerning the effect the amount of expenditures had on the women's opportunity to participate in the basketball program in particular or athletic programs in general.

The University's evidence was much the same as was presented in the summary report it had offered earlier. The University conceded that there are substantial differences in the athletic programs available to men and women, but pointed to the portion of ORS 659.150 which prohibits "unreasonable differentiation" in treatment, and argued that the differences in the programs are reasonable in light of: (1) the differences between revenue-generating and non revenue-generating sports; (2) different conference rules and requirements applicable to men's and women's sports; and (3) different levels of interest and development in women's and men's sports.

The hearings officer found the allegations of the petitioners' complaint to be "supported by the testimony" of the University officers and determined that the University was in violation of ORS 659.150. The Chancellor, however, approached the question from a different point of view. The apparently pivotal consideration to the Chancellor was the time frame for compliance with ORS 659.150. The Chancellor assumed that because the regulations implementing Title IX and the regulations implementing ORS 659.150 were similar, the time schedule for compliance should be the same. Accordingly, he concluded that the University was not in violation *at that time,* but that the deadline for compliance with ORS 659.150 would be the same as the compliance deadline for Title IX—July 21, 1978. (The Chancellor's order was issued March 28, 1978).

[784]

■■ We find no support in the legislative history for the Chancellor's determination to adopt a 3 year compliance schedule for ORS 659.150. The Chancellor interpreted the language of the statute and OAR 580-35.032(2) prohibiting "unreasonable" differentiation, to mean that the implementation is to be "reasonably accomplished."[3] Legislative history makes clear, however, that use of the word "reasonable" was addressed to the quality of discrimination and not to the alacrity with which discrimination would be abolished.[4] Moreover, the legislative history indicates that the legislature was unaware of the obstacles that would be encountered in bringing athletic programs into compliance with the law, and anticipated that immediate compliance would not be unduly burdensome.[5] Accordingly, to the extent that the Chancellor's

---

[3] In the "Conclusions of Law" portion of his order, the Chancellor states:

"The language of the State legislation supports the *Administrative Rules* which states [sic] that the implementation of the statute is to be reasonably accomplished and that the institutions shall be guided by Title IX in assessing equal opportunity."

[4] The first draft of House Bill 2131, which eventually became Chapter 204, Oregon Laws 1975, did not contain a definition of the word "discrimination." Tape Recording, House Committee on Education and School Finance, January 20, 1975. Tape 1, Side 2 at 766. The legislators subsequently revised H.B. 2131 to include a definition of "discrimination." Their expressed intention in drafting the definition was to make H.B. 2131 comply with the United States Supreme Court tests on equal protection and discrimination, which they viewed as requiring a reasonableness standard. *See,* Tape Recording, House Floor Debates on H.B. 2131, March 21, 1975, Tape 8, Side 2, at 863 *et seq.;* Tape Recording, House Floor Debates on H.B. 2131, May 8, 1975, Tape 20, side 1, at 405 *et seq.;* Minutes, Senate Committee on Education, April 10, 1975, p 6; Tape Recording, Senate Committee on Education, April 14, 1975, Tape 11, Side 2 at 292 *et seq.*

[5] *See, e.g.,* Tape Recording, Senate Floor Debates on H.B. 2131, May 7, 1975, Tape 16B, Side 2, at 452 *et seq.*

The fact that the legislature was unaware of the obstacles that would be encountered in bringing intercollegiate athletic programs into compliance with the law is brought home most clearly by comments during the Senate Floor Debates on H.B. 2131 which indicate that the senators did not agree on whether H.B. 2131 even applied to intercollegiate competitive athletics. *See,* Tape Recording, Senate Floor Debates on H.B. 2131, May 7, 1975, Tape 16B, Side 2, at 473-510. *But see* remark of Rep. Priestly in which he explains his vote in favor of the bill:

[785]

conclusion and order rest on his finding that the deadline for compliance is July 21, 1978, it is incorrect.

The order entered by the Chancellor, however, makes no mention of the time frame for compliance, but states:

"In reliance on findings by the hearings officer and the supporting record, we find the University of Oregon not to be in violation of ORS 659.150, applicable Administrative Rules and 20 U.S.C. 1681-86."

While purporting to adopt the hearings officer's findings, the Chancellor also made his own findings, which consisted in the main of a potpourri of observations and editorial comments and which included information which was not always present in the record.[6] While we appreciate the difficulty involved in resolving legal disputes of this sort, such a collection of findings and conclusions does not aid the parties in determining who won or lost, and upon what grounds. For example, the Chancellor has not indicated precisely which findings of the hearings officer were adopted nor has he drawn a connection between the findings, his conclusions, and the final order. *See Home Plate, Inc. v. OLCC,* 20 Or App 188, 530 P2d 862 (1975). It is difficult to tell from this order whether the final holding is based on the compliance schedule or something else. Petitioners apparently assume it was something else because they make little mention in their

"I voted for this bill with the clear understanding and assurance from Rep. Paulus * * * that the intent of the bill is to include school athletic and sports programs in its prohibition against discrimination on the basis of sex." Oregon House Journal, May 8, 1975, at 267.

[6] For example, the Chancellor's order recites that a recent change in the AIAW rules allows a member school to provide tutoring if made available to all women athletes. The Chancellor then states:

"The University has indicated its intention to extend tutoring services to women athletes."

There is nothing in the record to support this statement regarding the University's intentions. The Director of the Women's Athletic Program, Dr. Sisley, testified that the present policy, as required by AIAW rules, is that the University does not hire tutors for women athletes (although it does for men). She did not indicate there might be a change in the tutoring policy.

[786]

brief of the compliance schedule issue. In fact, petitioners assert in their brief that their appeal raises "only" two questions:

"[1] What legal standards should be applied to the athletic program to determine whether it meets the requirements of ORS 659.150, and OAR 580-35.000, *et seq.,* which prohibit discrimination based upon sex in [the University's] programs?

"[2] If the University of Oregon has discriminated on the basis of sex in its athletic program, what sanctions should be imposed by the Chancellor against the University."

Within this framework, it appears that petitioners' focal concern is with the components of "reasonableness," *i.e.,* what are the criteria to be used in determining whether the University's admittedly different treatment of the men's and women's teams is reasonable under ORS 659.150? Specifically, petitioners object to the University's and, in turn, the Chancellor's reliance on the revenue-generating ability of certain men's teams and reliance on athletic conference rules as justifications for different treatment of the men's and women's teams. What petitioners ask of us is a determination that the criteria of revenue-generating ability and conference rules should not have been considered in the hearings process or, if they should have been, were unduly weighted by the Chancellor.

The problem is that, without the appropriate set of factual findings and order by the Chancellor, we are unable to determine what criteria were used at all. It follows that the case must be remanded for a more careful analysis by the Chancellor as to the reasonableness of the University's different treatment of the men's and women's teams, with this analysis to be reflected in appropriate findings, conclusions and entry of an order. *Home Plate, Inc. v. OLCC, supra.*

We recognize that remanding this case for further and possibly different findings of fact postpones the resolution of a difficult issue. In aid of its resolution,

we address ourselves to certain questions raised by the parties and to the legal framework within which the facts should be analyzed by the Chancellor.

Both parties agree that the issue under ORS 659.150 is whether the differences in the athletic programs at the University are "reasonable."[7] Petitioners assert that while both the University and the Chancellor "have offered a variety of justifications for the differences [in the men's and women's athletic programs], * * * in no instance have they offered a justification that meets the standards of Oregon law." Petitioners additionally object to the University's reliance on criteria (which petitioners characterize as "standards") without first adopting them as rules, and assert that the applicable standards are those found in the administrative rules.

Petitioners misconstrue the process. The statutory standard is one of *reasonableness.* The regulations provide a framework for assessment of that issue. That the University offered various criteria as justifications for its different treatment of the teams does not constitute an attempt to create new standards while circumventing the rule-making process. These justifications are simply factors which the Chancellor may assess in determining whether the standard of reasonable differentation has been met. The University is entitled to offer those facts as explanations for its treatment of the athletic teams, just as petitioners

---

[7] As indicated in note 4, *supra,* in defining discrimination as any act which "unreasonably differentiates," the legislature intended to make Chapter 204 comply with the Supreme Court test for discrimination and equal protection. However, we are not entirely certain which test is the appropriate Supreme Court test for equal protection and sex discrimination. As one court remarked, its attempt to analyze the line of Supreme Court sex discrimination decisions from *Reed v. Reed,* 404 US 71, 92 S Ct 251, 30 L Ed 2d 225 (1971), to *Stanton v. Stanton,* 421 US 7, 95 S Ct 1373, 43 L Ed 2d 688 (1975), left "an uncomfortable feeling, somewhat similar to a man playing a shell game, who is not absolutely sure there is a pea." *Vorcheimer v. School Dist.of Phila.,* 400 F Supp 326, 340-41 (E.D. Pa 1975), *rev'd* 532 F2d 880 (3rd Cir 1976), *aff'd* by an equally divided court, 430 US 703, 93 S Ct 1761, 51 L Ed 2d 750 (1977). For our purposes it is enough that the Oregon standard, as enunciated in Chapter 204, is one of reasonableness.

are entitled to know if those facts served as compelling determinants in the Chancellor's decision. It is the absence of the latter information which has required remand here.

As noted above, however, petitioners primarily seek a holding that, as a matter of law, the three justifications offered by the University are not to be considered in determining reasonableness. We consider each justification individually.

## 1. *Revenue-Generation*
With regard to the revenue-generating ability of a sport, the University insists that such a criteria is of assistance in determining the funding levels for various sports, despite the fact that it results in difference in treatment of men's and women's teams because some men's teams generate substantial revenue and the women's team do not. The University argues that spending money on revenue-producing sports is necessary to the efficient operation and maintenance of the entire athletic program, from which the women's teams benefit as do the nonrevenue-generating men's sports.

■ We think the revenue-generating ability of a sport is a valid criterion which can be considered by the Chancellor in his assessment of the reasonableness of the University's actions. That is not to say that the revenue-generating ability of a sport is to be viewed as a static situation. With an emerging sport such as women's basketball, the University must take into account not only its present revenue-generating capabilities, but also the possibility of increasing its revenue-generating capabilities by the use of increased funding and support. This necessarily involves a complex analysis of economic and social factors, which is one of the functions of the University's administration. The way in which the school administration discharges this responsibility is and will continue to be reviewable under the Administrative Procedures Act, but this court cannot substitute its

[789]

own judgment for that of the administration, and will not otherwise intervene so long as it appears that the administration has not acted unreasonably or arbitrarily.

## 2. *Conference rules*

■ With regard to athletic conference rules, the University justifies its different treatment of the men's and women's teams in the aspects of tutoring, recruiting, payment of officials and grants-in-aid programs by reference to the different conference rules applicable to the men's and women's teams. However, if the University's actions in those particular areas—tutoring, officiating, grants-in-aid and recruitment—are found to be discriminatory by the Chancellor, the fact that the conference rules authorize the discriminatory treatment is no defense to the University's actions. A conference may permit unreasonable discrimination; Oregon law does not. A conference may *require* such discrimination; if so, the Oregon school cannot legally comply with such requirements.

## 3. *Level of interest and ability*

■ Finally, we come to the University's argument that the level of ability and interest in the women's programs is a factor to be considered in determining appropriate funding levels. The concept of equal opportunity to participate in athletics is of key importance to ORS 659.150. The level of development of ability and interest in the women's program would be an obvious factor in considering whether the actions and omissions of the University have had a disparate effect on opportunities for women to participate in athletics. It is, however, a factor which would require the testimony of the women athletes themselves to flesh out. The puzzling aspect of the record in this case is the lack of testimony from women athletes at the University as to the existence or nonexistence of that opportunity to participate in athletics and as to the support they are receiving from the University to raise the level of ability and interest in women's basketball. Whether or not the lack of this testimony is fatal to

petitioners' case will be for the Chancellor to assess; we note its absence only as a method of again pointing out the evidence-findings-conclusions- order requirement of the APA as explained in our decisions such as *Home Plate, supra.*

For further illustration and to assist the Chancellor and the parties on remand, we briefly examine portions of the record pertaining to the allegations in the petitioners' complaint and to the "findings" made by the Chancellor and hearings officer.

With respect to petitioners' allegations:

### 1. *Transportation*

The petitioners alleged that the men's basketball team has been provided with superior modes of transportation for out-of-town games, specificially first class air travel and/or charter bus travel, while the women have been transported in student-driven vans. The hearings officer and the Chancellor found that up until the spring of 1977 when the University merged the men's and women's athletic programs, the transportation provided to the women's team was inferior. The Chancellor went on to find, however, that as of spring, 1977, the University has employed "non-sex related criteria" for assignment of transportation to teams, with the announced policy being one of 'comparable transportation for comparable sports.' Whether or not this has sufficiently remedied the problem is not fully addressed. The Chancellor's findings and conclusions on this issue are insufficient in that even the adoption of neutral criteria may have a discriminatory effect.[8] *See e.g., Griggs v. Duke Power Co.,* 401 US 424, 91 S Ct 849, 28 L Ed 2d 158 (1971).

### 2. *Officiating*

■ Both the hearings officer and the Chancellor found the hiring of officials for the men's and women's teams

---

[8] It may be, however, that without testimony from the women athletes as to the effect of the "neutral" transportation policy, the Chancellor is required to find that the petitioners have failed to carry their burden in proving discrimination in the provision of transportation since the spring of 1977.

to be governed by their respective athletic conferences. The hiring of officials for the men's team is governed by the Pacific 10 Athletic Conference (Pac-10) rules; the hiring of officials for women's games is governed by the Northwest College Women's Sports Association (NCWSA). The differences in the provisions are striking: officials for the men's games are paid $125 a game plus mileage and expenses; officials for the women's games are paid $20 a game plus minor allowances for travel expenses. Neither the hearings officer nor the Chancellor made any conclusion as to whether these different provisions hindered the provision of comparable athletic opportunity to participants of both teams——a question which must be addressed if there is to be a finding of compliance with ORS 659.150.

### 3. *Coaching*

■ The findings made by the hearings officer and the Chancellor with regard to the coaching provided to the two teams consisted of a recitation of the number of coaches assigned to the team (one head coach and one assistant for the women's team; one head coach and three assistants for the men's team), the qualifications of the respective coaches, and the salary paid to the coaches and staff ($13,000 for the women's head coach, and $1,271 for assistants; $34,539 for men's head coach; and $21,000, $12,410 and $3,600, respectively, for assistants). The hearings officer found that as of March, 1975, there was an extreme disparity in the level of coaching provided to the teams which did not meet the reasonability test of ORS 659.150. The Chancellor made no finding or conclusion as to the comparable adequacy of the coaching provided to the two teams, other than to urge the adoption of "non-sex related criteria" to evaluate the level of coaching. The Chancellor also noted, and we would agree, that salary level is not the singularly most persuasive determinant of the adequacy of the coaching provided nor necessarily indicative of discrmination. It is, nonetheless, a factor to be considered, which when combined with testimony by the women athletes as to the

quality of coaching they are receiving and its effect on their opportunity to participate in athletics in a meaningful fashion would aid the Chancellor in determining whether or not the women have been provided an equal opportunity to participate.

4. *An equal commitment by University to competitive athletic programs for men and women.*

■ The hearings officer found that, as illustrated by the focal concerns set out in OAR 580-35.032, a disparity exists in the University's commitment to the basketball programs it offers for men and for women. The Chancellor made no finding on this allegation but emphasized that the philosophy of the directors of the men's and women's programs differ as do their respective goals for their programs. The essential finding that is lacking in the Chancellor's order concerning this subject is whether these different philosophies operate to restrict the women's opportunity to participate equally in athletics and whether they result in unreasonable differentiation in treatment. The impact of this allegedly different commitment on the part of the University to the strength of the two teams should be analyzed in light of those aspects of the program set out in OAR 580-35.032(1), *viz.,* the Chancellor must assess the "totality of athletic opportunity provided" and assess the degree to which the different philosophies result in an unreasonable differentiation of treatment.

In summary, upon remand, the Chancellor should address the allegations raised by petitioners, as well as those facets of the athletic programs set out in OAR 580-35.032, to determine whether the actions of the University have resulted in an unreasonable differentiation of treatment under ORS 659.150. In determining whether University action is unreasonable, the question of whether the University's action results in a disparate effect on opportunity for women to

[793]

participate in athletics must be evaluated.[9] In some instances, the amounts of money budgeted for the men's and women's team may indicate so clearly an unreasonable differentiation that no other evidence will be necessary to evaluate the discriminatory impact.[10] In other instances, testimony of the women athletes themselves as to the impact of certain policies and expenditures on their opportunity to participate in athletics may be essential and its absence fatal to petitioners' case.

Whether or not the passage of time and our clarification of the issues may cause the parties to believe that reopening the hearing for the presentation of additional evidence is necessary or appropriate will be for the parties to decide. We note only that to do so would not be inconsistent with this opinion.

Reversed and remanded.

---

[9] We note that whatever disparities may be found to exist between the two basketball programs, this season's final results are encouraging: the men's basketball team compiled a record of (12-15); the women's team was undefeated (20-0).

[10] For example, with regard to equipment, the University's budget for 1977-78 indicates that $7,600 was budgeted for equipment for the men's basketball team and $100 was budgeted for the women's team. The Chancellor may find that the extreme disparity in budgeted amounts for equipment is sufficient, standing alone, to indicate "an unreasonable differentiation in treatment"and does not need testimony from the University's women athletes to establish what already may be found to be an obvious inequity.