Argued and submitted February 27, judicial review dismissed as moot in part; reversed and remanded in part June 5, 2003

James MONTGOMERY,
Ellen Montgomery, Andy Montgomery,
Greg Nakashima, Esther Nakashima,
Greg Nakashima, and Anthony Nakashima,
*Petitioners,*

*v.*

BOARD OF EDUCATION
and Oregon School Activities Association,
*Respondents.*

581-021-0034-4-00; A117678

71 P3d 94

Charles F. Hinkle argued the cause for petitioners. With him on the opening brief were Jeremy D. Sacks, William R. Long, and ACLU Foundation of Oregon, Inc.

Michael D. Reynolds, Assistant Attorney General, argued the cause for respondent Board of Education. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Jonathan M. Radmacher argued the cause for respondent Oregon School Activities Association. With him on the brief was McEwen Gisvold, LLP.

Before Edmonds, Presiding Judge, and Kistler and Brewer, Judges.

BREWER, J.

## BREWER, J.

Petitioners seek review of a decision of respondent State Board of Education that held that respondent Oregon School Activities Association (OSAA) did not unlawfully discriminate when it refused to agree to adjust the Class 2A boys' basketball tournament schedule to ensure that the student petitioners (the students)[1] would not be scheduled to play on their Sabbath. Petitioners Andy Montgomery, Greg Nakashima, and Anthony Nakashima are students at the Portland Adventist Academy (PAA) who play or have played on PAA's basketball team. The remaining petitioners are their parents.[2] We dismiss the petition as moot as to Andy Montgomery and his parents and as to Greg Nakashima. We reverse and remand on the claims of Anthony Nakashima and his parents.[3]

We take the facts from the board's order, supplemented by undisputed facts in the record. OSAA is an organization of public and private schools that the board has approved to administer interscholastic activities. PAA is a private Seventh Day Adventist school and a member of OSAA. Petitioners are also Seventh Day Adventists. One of the tenets of Seventh Day Adventism is observing the Biblical Sabbath, which extends from sundown on Friday through sundown on Saturday. Neither PAA nor the students will participate in competitive activities, including sporting events, that occur during the Sabbath.

In 1996, the PAA boys' basketball team was eligible for the Class 2A tournament, and PAA asked OSAA to adjust the schedule of the tournament games to avoid a conflict with its Sabbath. OSAA agreed to switch the schedule of the Friday games as necessary but refused to adjust the schedule

---

[1] We refer to the students as "the students" when it is necessary to distinguish them from the parents. Some of the original students dropped out of the case as they graduated, while others who are younger joined. Our references to "the students" are to those students who were involved in the case at the relevant times.

[2] The board held that the parents have standing because of their derivative interests from their children and because of their legal obligation for their children and their education. OSAA does not challenge that conclusion on review.

[3] One of Anthony and Greg Nakashima's parents is also named Greg Nakashima. We dismiss the claims of the son but not of the parent.

of the Saturday games. The Friday games are relatively interchangeable, but the Saturday games follow a set order, with the championship game coming last. OSAA stated that, if PAA qualified for a Saturday game that conflicted with its Sabbath and refused to play, it would have to forfeit that game. In fact, PAA qualified for, and won, the championship game, which began after sundown on Saturday. As a result, no actual conflict occurred.

OSAA's agreement to allow PAA to forfeit a Saturday game led to numerous complaints from other schools; the complainants were particularly concerned about the possibility of the consolation bracket of the tournament ending in a forfeit. As a result, in 1997 OSAA told PAA that it would no longer authorize PAA to forfeit a game that could not be rescheduled simply by switching game times. OSAA's current policies also prohibit a team or an individual player from entering a tournament intending to withdraw from or forfeit a game before the tournament's conclusion.[4] In addition, OSAA stated that it was unwilling to accommodate PAA's concerns if doing so involved changing from a two-game to a three-game session, adding an additional venue, or eliminating the consolation bracket.

The board found that OSAA does not consider religious beliefs in scheduling the tournament. It also found that OSAA has never been asked to accommodate the religious beliefs of anyone other than Seventh Day Adventists with regard to the Class 2A boys' basketball tournament. Although OSAA does not schedule games on Sundays, the board found that the current basis for that policy consists of valid secular reasons, such as the need for a day for teams to travel home, not the accommodation of a particular group's religious beliefs. OSAA has never been asked to reschedule a tournament game for a planned, but avoidable, secular activity, and it would not do so if asked.

In 2000, the students asked OSAA to accommodate their religious practices in scheduling that year's Class 2A tournament; OSAA declined. Petitioners then appealed that

---

[4] OSAA does not interpret that rule as applying to PAA because PAA intends to win all of its games and thus avoid a forfeit.

denial to the board under ORS 339.430(3), which provides for an appeal to the board of decisions of an approved voluntary organization that administers interscholastic activities. The Superintendent of Public Instruction, acting on behalf of the board, denied the appeal in February 2002. Petitioners then sought judicial review.

We first consider whether the case is moot as to some or all of the petitioners. According to the record, in December 2001 (and, thus, at the time of the 2002 Class 2A tournament) Andy Montgomery and Greg Nakashima were juniors at PAA and Anthony Nakashima was a freshman. All intended to continue participating on PAA's basketball team. While this case was pending, the parties filed additional information that indicated that the 2003 Class 2A tournament occurred in March. Petitioners' counsel has since informed us that both Andy and Greg are presently seniors and will no longer play basketball at PAA. The case is therefore moot as to them and as to Andy's parents. We dismiss the petition for review as to those parties. *See Barcik v. Kubiaczyk*, 321 Or 174, 895 P2d 765 (1995). Petitioners' counsel has also informed us that Anthony will be a junior at PAA in fall 2003 and intends to play on its basketball team during the 2003-04 school year. The case is not moot as to either him or his parents. We turn to the merits.

Petitioners base their claims on ORS 659.850,[5] the relevant portions of which provide:[6]

"(1)   As used in this section, 'discrimination' means any act that unreasonably differentiates treatment, intended or unintended, or any act that is fair in form but discriminatory in operation, either of which is based on age, disability, national origin, race, marital status, religion or sex.

"(2)   No person in Oregon shall be subjected to discrimination in any public elementary, secondary or community college education program or service, school or interschool activity where the program, service, school or activity is

---

[5] *Former* ORS 659.150 (1975), *renumbered as* ORS 659.850 (2001).

[6] ORS 659.850(3) authorizes the board to adopt rules to enforce compliance with the statute. OAR 580-0021-0045, which the board adopted for that purpose, is identical to the statute in all aspects that are relevant to this case.

financed in whole or in part by moneys appropriated by the Legislative Assembly."

As petitioners note, the statute defines two kinds of discrimination in educational programs, each of which is familiar from other federal and state discrimination law. It first prohibits acts that "unreasonably differentiate[ ] treatment, intended or unintended," thus prohibiting disparate treatment discrimination. Secondly, it prohibits acts that are "fair in form but discriminatory in operation," thus prohibiting disparate impact discrimination. The words of the statute, which among other things closely paraphrase the seminal disparate impact case, *Griggs v. Duke Power Co.*, 401 US 424, 431, 91 S Ct 849, 28 L Ed 2d 158 (1971) (Title VII of Civil Rights Act of 1964 (Title VII), proscribes "practices that are fair in form, but discriminatory in operation")[7] clearly indicate the legislature's intent to cover disparate impact as well as disparate treatment discrimination.

■■  The statute expressly prohibits disparate treatment only if the differentiation is unreasonable; it does not expressly limit the prohibition of disparate impact in the same way. In *Aiken v. Lieuallen*, 39 Or App 779, 593 P2d 1243 (1979), which primarily involved disparate treatment discrimination against women in collegiate athletics, it appears that we assumed, based in part on the legislative history of the statute, that the reasonableness requirement also applied to disparate impact discrimination. *Id.* at 785. Analyzing the words of the statute indicates that that assumption was correct. ORS 659.850(1) first defines "discrimination" as "any act that unreasonably differentiates treatment." It then defines "discrimination" as also including an act that is "fair in form but discriminatory in operation."

---

[7] In *Griggs*, the Supreme Court held that the employer's requirement that persons seeking employment in certain positions hold a high school diploma violated Title VII. Although the requirement was fair in form, its effect was to exclude most African-American, but not most white, applicants from those positions. Thus, in the absence of proof that a diploma was a necessary qualification to performing the work involved, the requirement had a discriminatory impact, and the court held violated Title VII. 401 US at 431-33.

The only reference in the statute to an act that is "discriminatory" is the immediately preceding definition of "discrimination," which requires that the differentiation be unreasonable. Thus, an act that is fair in form is discriminatory in operation only if it has an impact that unreasonably differentiates among the protected classes. That is consistent with the rule that an employer can justify a disparate impact by showing that it is necessary to the employer's business. *See Teamsters v. United States*, 431 US 324, 335-36 n 15, 97 S Ct 1843, 52 L Ed 2d 396 (1977); *Butler v. Vanagas*, 149 Or App 443, 450, 944 P2d 972 (1997), *rev den*, 326 Or 464 (1998) (discussing federal disparate impact law). Our conclusion is also consistent with the law that we discuss below concerning reasonable accommodations of religious practices.

In its discussion of petitioners' claims under the statute, the board focused on whether OSAA's actions constituted intentional discrimination against PAA and the students. By that focus, it limited its analysis to disparate treatment discrimination. The board concluded that OSAA's scheduling of tournament games was religion-neutral and that its practice of not scheduling games on Sunday was not a religious accommodation. According to the board, although OSAA will modify schedules when doing so will be to OSAA's benefit—such as adjusting to a broadcaster's wishes, the available facilities, or the weather—it does not accommodate students' secular or religious needs. After 1996, OSAA would have attempted to prevent a forfeit for either secular or religious reasons. The foundation of the board's decision denying petitioners' appeal is its conclusion that "OSAA does not differentiate between secular and sectarian circumstances when making its tournament decisions. Any tournament rescheduling by OSAA is based on non-preferential adjustments that serve to maintain competitive balance and other neutral OSAA policies." Because it found that OSAA did not differentiate based on religion, it was unnecessary for the board to decide whether any differentiation was reasonable. It nevertheless considered petitioners' arguments about reasonableness and rejected each of them. It did so in the context of the reasonableness of OSAA's alleged disparate treatment, not of the disparate impact of OSAA's policies, and it made no

attempt to determine the reasonableness of any accommodation of the students' religious practices.

Thus, in its decision the board rejected arguments that OSAA intentionally differentiated in its treatment of PAA and other schools—that is, the board held that OSAA had not committed disparate treatment discrimination. The board did not, however, consider whether OSAA's actions, although fair in form, were discriminatory in effect. That is, it did not decide whether OSAA's actions constituted disparate impact discrimination. It also did not consider whether the statute required OSAA to adjust its normal policies in order to make a reasonable accommodation to petitioners' religious needs, although it recognized that petitioners sought such an accommodation.

■ Petitioners first assign error to the board's conclusion that OSAA's refusal to accommodate their religious beliefs did not violate either the statute or the administrative rule.[8] Among other things, they argue that there are possible reasonable accommodations—including some that OSAA at one time considered making—but that it has refused to make any accommodation whatsoever. That argument requires us to consider whether the statutory prohibition of religious discrimination requires OSAA to accommodate petitioners' religious beliefs and practices by making adjustments that it would not make for nonreligious practices. We conclude that it does.

There is no dispute that the prohibition in ORS 659.850 of discrimination based on religion means that OSAA may not use a student's religion as a basis for discriminating against the student's participation in the activities that it sponsors. To that extent the prohibition is comparable to the other statutory prohibitions against discrimination based on such things as race or national origin; those characteristics do not affect a person's ability to participate in the

---

[8] Petitioners combine their argument on this assignment of error with their argument on the second assignment, which is that the board erred in finding that OSAA's reasons for not scheduling games on Sundays do not include accommodating a particular group's religious beliefs. As to that assignment, petitioners simply disagree with the board's reading of the record. There is substantial evidence to support the board's finding, and we reject the second assignment without further discussion.

activities, and using them as a basis for making distinctions would clearly be disparate treatment discrimination.[9] However, there are circumstances in which religion may be more than a characteristic that is an illegal basis for creating restrictions on participation. A person's religious obligations concerning such things as days or times of observance, food, and clothing may come into conflict with secular arrangements and expectations. Thus, a person's religion may directly affect the person's ability to participate in OSAA's activities in ways that race and national origin do not. A policy that is neutral in its form can have a direct impact on someone whose religious obligations come into conflict with the policy; in some circumstances a facially neutral policy can force a person to choose between following his or her religion or participating in the activity. The question is whether ORS 659.850 requires OSAA to attempt to adapt its programs to its participants' religious obligations in order to avoid that problem—that is, whether OSAA has a positive duty to make a reasonable accommodation to participants' religious needs.

■     It is clear from the board's findings that, without some accommodation of Anthony's religious obligations, OSAA's policy will have a direct impact on his ability to participate in the Class 2A basketball tournament. Because the legislature based ORS 659.850 on concepts that had developed under federal employment discrimination law in the years between the enactment of Title VII and the enactment of the Oregon statute,[10] the federal application of those concepts is part of the legal context of the statute and assists our

---

[9] We do not need to consider the extent to which a person's gender may affect the person's ability to participate except to note that OSAA sponsors a number of separate boys' and girls' athletic programs.

[10] Even if the words of the statute did not make this point clear, the legislative history does. As the bill left the House, it contained a definition of "discrimination" that was limited to disparate treatment discrimination. HB 2131 (1975) (A-Engrossed). In the Senate, the American Civil Liberties Union objected to the definition and suggested either relying on existing judicial definitions or replacing it with a different definition that expressly included a disparate impact theory. Minutes, Senate Committee on Education, April 10, 1975, 6-7 (statement of Ann Kelly). The Senate Committee originally removed the existing definition. HB 2131 (1975) (B-Engrossed). After debate, the Senate voted to re-refer the bill to committee, in part because of uncertainty of its scope. At the recommendation of its staff, the committee then adopted the current definition, which is the ACLU's proposal with technical revisions by Legislative Counsel. Senate Committee on Education, Staff Note to Committee Chair on B-Eng. HB 2131, April 22, 1975; Minutes, April 29, 1975, 1.

evaluation of it. In 1975, when the legislature adopted ORS 659.850, federal law expressly required employers to make reasonable accommodations to their employees' religious obligations. It arrived at that conclusion after varying judicial and administrative opinions on the subject that led Congress, in effect, to adopt the administrative view of the meaning of Title VII. That development sheds significant light on the meaning of ORS 659.850.

The question of whether an employer could apply a general policy to persons on whom it had a differential impact because of their religious obligations arose soon after the enactment of Title VII. In 1966, the Equal Employment Opportunity Commission (EEOC), which was charged with enforcing the act, issued a guideline that interpreted Title VII as requiring employers to make limited accommodations for an employee's religious beliefs or duties but emphasized the employer's ability to apply its policies concerning hours of work to all employees uniformly. Among other things, the guideline stated that, in the absence of an intent to discriminate, a job applicant who accepted a position knowing or having reason to believe that the job requirements would conflict with his or her religious obligations was not entitled to demand any accommodation. 29 CFR § 1605.1 (1967), *quoted in part in Dewey v. Reynolds Metals Company*, 429 F2d 324, 329-30 (6th Cir 1970), *aff'd by an equally divided court*, 402 US 689, 91 S Ct 2186, 29 L Ed 2d 267 (1971).

In 1967, the EEOC adopted a replacement guideline that reflected an understanding of Title VII that was more sympathetic to the employee's religious obligations. In that guideline, the EEOC referred specifically to complaints by employees who had been discharged or not hired for refusing to work during the Sabbath or on other special days of religious observance. The EEOC stated that it believed that the duty not to discriminate on religious grounds "includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees" when the employer could do so "without undue hardship on the conduct of the employer's business." It placed the burden of proving that a proposed accommodation created undue hardship, and thus was unreasonable, on the employer. 29 CFR § 1605.1 (1968), *quoted in Dewey v. Reynolds Metals Co.*, 300 F

Supp 709, 712 (WD Mich 1969), *rev'd*, 429 F2d 324 (6th Cir 1970), *aff'd by an equally divided court*, 402 US 689, 91 S Ct 2186, 29 L Ed 2d 267 (1971).

*Dewey* is the leading case testing the 1967 EEOC guidelines, although its ultimate result was inconclusive. The opinions of the District Court, which found in the plaintiff's favor, and of the majority of the Sixth Circuit, which reversed that decision, frame the issues in a way that is relevant to this case. The plaintiff in *Dewey* refused, because of his religious convictions, to work compulsory overtime on Sunday, which he considered to be the Sabbath. He also ultimately refused to exercise his option to ask another person to work in his place because he believed that it was as sinful for him to ask another person to work on the Sabbath as it would be to work himself. The defendant fired him because of that refusal, and an arbitrator upheld the firing under the applicable collective bargaining agreement. The District Court found that there was no evidence that the defendant would suffer hardship if the plaintiff prevailed or of what effects accommodating the plaintiff's religious beliefs would have on the employer's business.

The defendant argued that its rules could not be discriminatory because they did not apply differently to different groups. Rather, its compulsory overtime requirement applied equally to all employees. The District Court rejected that argument, stating that "it is entirely possible that while a rule may apply equally to all employees, it does not have an equal impact on them." *Dewey*, 300 F Supp at 713. Whether the rule was discriminatory on its face was only the first step of the analysis. The next step was to determine whether the rule was discriminatory in its impact. The District Court noted that, under the United States Supreme Court's approach in *Sherbert v. Verner*, 374 US 398, 83 S Ct 1790, 10 L Ed 2d 965 (1963), a rule that forces a person to choose between his or her religion and governmental benefits penalizes the person because of his or her religion. Similarly, the plaintiff had "been forced to choose between his religion and his job," a choice that was "thereby discriminatory in its effect." The court also relied on the 1967 EEOC guidelines, which it believed to be a "very reasonable interpretation" of Title VII. Because the defendant had not made a reasonable

accommodation to the plaintiff's religious needs, as the guidelines required, and because it had not shown that an accommodation would cause it undue hardship, the plaintiff prevailed. *Dewey*, 300 F Supp at 714-15.

On appeal, the Sixth Circuit reversed the District Court's decision. The majority emphasized that the defendant's rules were not discriminatory on their face and summarily rejected the District Court's discussion of their discriminatory impact. Its only explanation for rejecting that theory was a comment that *Sherbert* involved state rather than private action. *Dewey*, 429 F2d at 329. The majority then concluded that the plaintiff had not proved illegal discrimination under Title VII. Its explanation was based on a narrow view of what constituted discrimination:

> "The reason for Dewey's discharge was not discrimination on account of his religion; it was because he violated the provisions of the collective bargaining agreement entered into by his union with his employer, which provisions were applicable equally to all employees. * * *
>
> "* * * * *
>
> "* * * The employer did not question Dewey's right to freedom of religion; [the employer] did question Dewey's right to practice his religious beliefs on it and to interfere with the operation of its plant."

*Id.* at 330-31.[11] Finally, the court construed the law as requiring "a finding that the employer has intentionally engaged in an unlawful employment practice before the court may award relief." *Id.* at 331. One judge dissented, agreeing with the District Court's view of an employer's obligation and the effect of the EEOC guideline. *Id.* at 332-34 (Combs, J., dissenting).

The majority in *Dewey* subsequently expanded on its views in an opinion denying the plaintiff's motion for rehearing en banc. It emphasized its belief that the only purpose of Title VII was to prohibit disparate treatment discrimination:

---

[11] The majority essentially ignored the District Court's finding that there was no evidence that Dewey's refusal to work on Sunday had actually interfered with the operation of the defendant's plant.

"Nowhere in the legislative history of the Act do we find any Congressional intent to coerce or compel one person to accede to or accommodate the religious beliefs of another. * * *

"* * * * *

"To construe the Act as authorizing the adoption of Regulations which would coerce or compel an employer to accede to or accomodate [sic] the religious beliefs of all of his employees would raise grave constitutional questions of violation of the Establishment Clause of the First Amendment."

*Dewey*, 429 F2d at 334. The Supreme Court granted *certiorari* and affirmed by an equally divided court. *Dewey v. Reynolds Metals Company,* 402 US 689, 91 S Ct 2186, 29 L Ed 2d 267 (1971). Although *Dewey* thus ended with an inconclusive result,[12] the contrasting opinions of the District Court and the Sixth Circuit dissent, on the one hand, and the Sixth Circuit majority, on the other, remain significant, in part because they reflect the arguments of the parties in this case.

So far as federal employment law is concerned, Congress resolved the issue in 1972 when it amended Title VII of the Civil Rights Act of 1964 by adding 42 USC section 2000e(j). That provision defines "religion" to include "all aspects of religious observance and practice" unless the employer demonstrates that it could not "reasonably accommodate to an employee's * * * religious observance or practice without undue hardship on the conduct of the employer's business."[13] Congress thus adopted the interpretation of Title VII that the EEOC stated in its 1967 guidelines and rejected

---

[12] As the Supreme Court later noted, *Dewey* was inconclusive for a number of reasons. First, judgment by an equally divided court is not entitled to precedential weight. Secondly, the Sixth Circuit relied in part on the decision of an arbitrator who had ruled against the plaintiff's claims under a collective bargaining agreement. The Court had not yet ruled that such arbitration does not affect the right to bring a claim under Title VII. *See Alexander v. Gardner-Denver Company*, 415 US 36, 94 S Ct 1011, 39 L Ed 2d 147 (1974). Finally, the events in *Dewey* occurred before the effective date of the 1967 guidelines. *Trans World Airlines, Inc. v. Hardison*, 432 US 63, 73 n 8, 97 S Ct 2264, 53 L Ed 2d 113 (1977).

[13] After the adoption of ORS 659.850, the Bureau of Labor and Industries adopted a rule that construed current ORS 659A.030 similarly to the 1967 EEOC guideline and 42 USC § 2000e(j). OAR 839-005-0010(6)(a).

the approach of the *Dewey* majority. The legislative history of the amendment, which refers both to the guidelines and to *Dewey*, makes that purpose explicit. *See* 118 Cong Rec 7167 (1972), *cited in Trans World Airlines, Inc. v. Hardison*, 432 US 63, 74 n 9, 97 S Ct 2264, 53 L Ed 2d 113 (1977). At the time that the legislature adopted ORS 659.850, federal employment discrimination law required a reasonable accommodation to religious practices.[14] By that time also, the Supreme Court in *Griggs* had expressly adopted the disparate impact theory of discrimination that was the foundation for the District Court's and Sixth Circuit dissent's opinions in *Dewey* and that the Sixth Circuit majority in *Dewey* ignored.

The parties' arguments in this case track the different approaches of the opinions in *Dewey*. The heart of the board's decision is its conclusion that OSAA took the actions in question in order to serve its own purposes, not with the intent of discriminating against petitioners or their religion.[15] In its brief, the board argues that it was reasonable for OSAA to refuse PAA's request because rescheduling a game only when it served OSAA's interests showed no favoritism to any group or individual and thus was not discriminatory. Indeed, the board argues, granting PAA's request when it would serve only PAA's interests would in itself discriminate on the basis of religion against the other participants in the tournament. The board, like the Sixth Circuit majority in *Dewey*, appears to treat a demand for a reasonable accommodation as a request for illegal discrimination. It rejects any suggestion that the different impact that OSAA's policy has on those who observe a Saturday Sabbath and those who do not has an illegal disparate impact on the Sabbatarians. In contrast to the board's position, the heart of petitioners' argument is that ORS 659.850 required OSAA to make an attempt to accommodate their religious beliefs and practices.

---

[14] *Hardison* is the leading Supreme Court case on the nature of a reasonable accommodation; there are also extensive circuit court decisions on the issue.

[15] As we have noted, under federal discrimination law a failure to make a reasonable accommodation need not be intentional. *Ron Tonkin Chevrolet Co. v. Continental Ins. Co.*, 126 Or App 712, 715-16, 870 P2d 252, *rev den*, 319 Or 625 (1994). In addition, ORS 659.850(1) defines discrimination to include disparate treatment that is "intentional or unintentional."

Their position is similar to that of the District Court and the Sixth Circuit dissent in *Dewey*.

■ At the time that the Oregon legislature adopted the definition of "discrimination" in ORS 659.850(1), federal law was consistent with the 1967 EEOC guidelines and the District Court's decision in *Dewey*. The concepts that the legislature used in defining discrimination were also consistent with that federal law. The legislature expressly extended prohibited discrimination to include both actions that unreasonably differentiate treatment and actions that are "fair in form but discriminatory in operation." By thereby adopting the disparate impact theory of *Griggs*, the legislature also rejected the foundation of the Sixth Circuit's decision in *Dewey* and necessarily rejected the basis for the board's position in this case.[16] Accordingly, under the statutory definition, for OSAA to require a person to choose between a religious obligation and participation in a covered activity, without first attempting to find a reasonable accommodation for the conflict, is to act in a way that is fair in form but discriminatory in operation. It is therefore illegal discrimination.

OSAA, and to a somewhat lesser extent the board, argue that requiring OSAA to accommodate petitioners' religious obligations would constitute religious discrimination against the other participants in the tournament. OSAA relies in part on *Estate of Thornton v. Caldor, Inc.*, 472 US 703, 105 S Ct 2914, 86 L Ed 2d 557 (1985), in which the Supreme Court held that a statute that prohibited dismissing a person for refusing to work on that person's Sabbath violated the Establishment Clause of the First Amendment. The Court noted that the statute imposed an absolute duty on employers and employees to conform their business practices to one employee's particular religious needs. The law commanded that Sabbath religious concerns automatically

---

[16] In April 1975, while the legislature was considering the statute, the Oregon Supreme Court issued an opinion that discussed *Griggs* and may have adopted the disparate impact theory as part of Oregon Law. *School District No. 1 v. Nilsen*, 271 Or 461, 469-70, 473, 480-83, 534 P2d 1135 (1975). There is no reference to that decision in the written legislative history. There is, however, some indication in the floor discussion that the legislature intended to follow United States Supreme Court law on discrimination. *See Aiken*, 39 Or App at 785 n 4.

control over all secular interests in the workplace. There were no exceptions for situations in which the employer's compliance would place significant burdens on it or on other employees, and it allowed no consideration of whether the employer had proposed a reasonable accommodation. *Id.* at 708-10. That unyielding weighting in favor of the Sabbath, the Court held, gave the statute a primary effect that impermissibly advanced a particular religious practice. *Id.* at 710.

■ Contrary to OSAA's suggestion, *Thornton* does not mean that a reasonable accommodation of religious obligations violates the Establishment Clause or is otherwise discriminatory. To require OSAA and the other participants in the Class 2A tournament to accommodate petitioners' religious obligations does not mean that they are endorsing petitioner's religious views, nor are they being discriminated against on religious grounds. There is no suggestion in the record that any proposed accommodation might cause a conflict with another participant's religious obligations. As Justice O'Connor, with whom Justice Marshall joined, stated in her concurrence in *Thornton*, the Connecticut statute is readily distinguishable from the religious accommodation provisions of Title VII. Outlawing employment discrimination based on several categories, including religion, has the purpose of ensuring that employment opportunities are available to all groups in a pluralistic society. In addition, Title VII requires only a reasonable accommodation, not the absolute accommodation that the Connecticut statute required. Thus, Justice O'Connor emphasized, Title VII is a valid anti-discrimination law, not an endorsement of a particular religious practice. *Id.* at 711-12 (O'Connor, J., concurring).[17]

Our conclusion that ORS 659.850 required OSAA to attempt to find a reasonable accommodation of the students'

---

[17] Although the Supreme Court has not decided the issue, all federal circuit courts that have done so, including the Ninth Circuit in a case decided after *Thornton,* have held that the religious accommodation requirements of Title VII are constitutional. Andrew M. Campbell, Annotation, *What Constitutes Employer's Reasonable Accommodation of Employee's Religious Preferences Under Title VII of Civil Rights Act of 1964,* 134 ALR Fed 1, 146-52, § 8 (1996); *Intern. Ass'n of Machinists v. Boeing Co.,* 833 F2d 165, 170-71 (9th Cir 1987), *cert den,* 485 US 1014 (1988).

religious needs means that the board committed legal error by failing to consider whether OSAA had fulfilled that obligation. The board left unresolved the question of whether a reasonable accommodation was possible, by switching Saturday game times or venues, allowing a forfeit, or otherwise. That question requires additional findings, either on this record or on an expanded one; it is thus beyond our authority on review. *See* ORS 183.482(8)(a). Rather, the board must reconsider its order, make the necessary findings, and draw the appropriate legal conclusions. In doing so it should be guided by our discussion, and it may find assistance from the extensive federal law concerning what kinds of accommodations are reasonable and what kinds of hardships are undue. *See, e.g., Hardison; Balint v. Carson City, Nev.*, 180 F3d 1047 (9th Cir 1999); *Heller v. EBB Auto Co.*, 8 F3d 1433 (9th Cir 1993). The board may also find the impact that OSAA's policy has on the school that the students attend, not simply on petitioners as individuals, to be relevant. Those are matters for it to consider in the first instance.[18]

Judicial review dismissed as moot as to petitioners James Montgomery, Ellen Montgomery, Andy Montgomery, and Greg Nakashima; as to other petitioners, reversed and remanded for reconsideration.

---

[18] The basis for our decision makes it unnecessary to consider petitioners' other assignments of error, which generally raise constitutional issues.