Argued and submitted December 16, 2003; resubmitted en banc February 9, on appeal, paragraph 2 of judgment modified to delete "abuse of discretion" and insert "error of law"; award of attorney fees reversed; otherwise affirmed; affirmed on cross-appeal March 2, 2005

Nancy POWELL,
Individually and as Guardian Ad Litem for
Remington Powell,
*Respondents - Cross-Appellants,*

*v.*

Stan BUNN,
Superintendent of Public Instruction,
Oregon Department of Education,
and Portland Public School District No. 1J,
*Appellants - Cross-Respondents.*

0104-03557; A117310

108 P3d 37

See also, 185 Or App 334, 59 P3d 559.

Janet A. Metcalf, Assistant Attorney General, argued the cause for appellants - cross-respondents Stan Bunn and Oregon Department of Education. With her on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

William H. Walters argued the cause for appellant - cross-respondent Portland Public School District No. 1J. With him on the briefs were Jeffrey D. Austin and Miller Nash LLP.

Charles F. Hinkle argued the cause for respondents - cross-appellants. On the opening brief were Kenneth A. Wittenberg and Wittenberg & Pitzer, LLP. On the reply brief was Charles F. Hinkle.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Schuman, and Ortega, Judges.

BREWER, C. J.

Linder, J., concurring.

Landau, J., dissenting.

## BREWER, C. J.

The state Superintendent of Public Instruction, the Oregon Department of Education, and the Portland Public School District (respondents)[1] appeal from the trial court's decision in this action for judicial review of a final order that the superintendent issued in other than a contested case. ORS 183.484. The superintendent declined to proceed further on petitioners' complaint of discrimination on the ground that there was no substantial evidence that the district's policy of permitting the Boy Scouts of America to make presentations to students during school hours constituted discrimination on the basis of religion in violation of ORS 659.850.[2] The trial court held that the superintendent abused his discretion in so acting. The court also awarded attorney fees to petitioners, payable by all respondents. Petitioners Remington Powell and his mother Nancy Powell[3] cross-appeal, arguing that the court should have entered a judgment determining that discrimination existed rather than remanding the case to the superintendent for further proceedings. On the merits of the appeal, we modify the legal basis for the trial court's judgment but affirm its dispositive order. We reverse the award of attorney fees. On the cross-appeal, we affirm.

■ The issues in this case arise from the same circumstances that were involved in *Powell v. Bunn*, 185 Or App 334, 59 P3d 559 (2002), *rev den*, 336 Or 60 (2003) (*Powell I*). In that case, petitioners challenged the district's actions, in part under ORS 327.109, which sets out procedures for

---

[1] We refer to the parties by their designations before the trial court. The Superintendent of Public Instruction acts as the administrative officer of the Board of Education and as executive head of the Department of Education. ORS 326.310. The Department of Education functions under the direction and control of the Board of Education. ORS 326.111. The Board of Education establishes policy for the administration and operation of public elementary and secondary schools and community colleges and has general rulemaking authority for that purpose, ORS 326.011; ORS 326.051, as well as rulemaking authority relating to the specific issue presented here, as we discuss below.

[2] ORS 659.850 was formerly ORS 659.150 and was given its current designation in 2001. We will use the current designation in this opinion.

[3] Nancy Powell is Remington's mother and appears both as his guardian *ad litem* and in her own capacity.

responding to a complaint that a school district "sponsors, financially supports or is actively involved with religious activity." We concluded that the legislature intended ORS 327.109 to codify federal First Amendment Establishment Clause principles and decided the case on that basis. We held that, because the school district's actions did not rise to the level of an unconstitutionally excessive entanglement of government with religion, petitioners' challenge failed. The record in this case is similar to the record in *Powell I*, although it contains some additional information. The issue, as we discuss below, is whether there is substantial evidence of discrimination.[4]

The Boy Scouts is a private organization that, among other things, provides programs for boys of elementary school age, beginning with the first grade. One requirement for participation in a Scouting program is that the boy profess belief in a theistic God. The Scout Oath includes a promise to "do my duty to God," while the Scout Law includes a statement that "[a] Scout is REVERENT. A Scout is reverent toward God. A Scout is faithful in his religious duties. He respects the beliefs of others." The Cub Scout Promise and the Tiger Cub Promise, which apply to programs for younger boys, include similar statements. The Boy Scouts treats the statements as a recognition of general theistic principles that are not tied to any specific religion, and participants include believers in a number of religions. The Boy Scouts, however, explicitly excludes atheists from eligibility for participation in its activities. It states that the "tenets of most world religions form the foundation of Scouting's values" and maintains that "no child can develop to his or her fullest potential without a spiritual element in his or her life."

The Boy Scouts recruits a large proportion of the participants in Scouting programs from the public schools, and it regularly sends representatives to the district's schools in order to encourage students to join. In fall 1996, Remington was a student in the first grade at Harvey Scott Elementary

---

[4] Because we are reviewing an order in other than a contested case, the relevant facts are those that appear in the record at the trial court. They are not limited to the facts before the agency at the time that it issued the order on review. *Norden v. Water Resources Dept.*, 329 Or 641, 649, 996 P2d 958 (2000).

School, one of the district's schools. In September, a teacher distributed a Boy Scouts promotional flyer to him and other students during their regular class period. In October, during the school's lunch period, while Remington and other students were in a room where the district required them to be, a district employee introduced a Boys Scouts representative, who then made a presentation encouraging boys to join a Scouting program. The representative and the district employee attached hospital-style bracelets containing information about the time and place for the first meeting to the wrists of interested boys. Remington thought that the program sounded like fun and got a wrist bracelet.

Nancy knew that Remington was ineligible for membership in the Scouts because he is an atheist. She complained to the school and the district about the presentation because of what she believed was the negative impact on Remington of subjecting him to the organization's discriminatory practices. There was a similar presentation at Remington's school in September 1997, except that the district employee did not assist in attaching the wrist bracelets. In April 2000, the official school newsletter contained an invitation for boys and their parents to attend a Cub Scout open house at a nearby church. Throughout this period, the district was aware that the Scouts excluded potential participants who did not express a belief in God.

In April 2000, petitioners filed a discrimination complaint with the district under ORS 659.850 and the implementing rules, OAR 581-021-0045 to 581-021-0049. In July, the district's board, by a divided vote, denied the complaint. In September 2000, the district's deputy superintendent issued guidelines to all school building administrators on permitting community organizations to use school facilities during noninstructional time "in response to the many questions we have been receiving about appropriate handling of Boy Scout materials and presentations." Although the guidelines are not a formally adopted district policy, they generally guide building administrators in decisions concerning the use of school property, and the parties treat them as authoritative. According to the guidelines, noninstructional time includes lunch and recess periods during the regular school day. The guidelines give administrators discretion to allow

the distribution of flyers provided by community organizations, specifically including the Boy and Cub Scouts, and to allow volunteers to make brief presentations to students and parents about their programs. Under the guidelines, administrators may permit the Boy Scouts to make presentations during noninstructional time during the school day. The guidelines also guide the administrators' discretion in permitting groups to distribute materials during their schooltime presentations. It would violate the guidelines for a Boy Scouts representative to make a presentation during instructional time or for a school district employee to assist in placing wrist bracelets on interested boys. It does not violate the guidelines for a representative to make a presentation during the lunch period or to be present at the school at that time.

The record includes videotapes of four presentations that a Boy Scouts representative made at district schools in fall 2001, after the adoption of the guidelines. In all but one videotape, a district principal, teacher, or administrator first quieted the students and told them to listen to the representative, who then made a short presentation to everyone and invited interested boys to talk with him further, either in the lunch room or outside on the school grounds. In the remaining videotape, the district employee mentioned the representative's presence and availability. In all of the videotapes, the representative spent 15 or more minutes with those boys who came up to talk with him, handing out brochures, answering their questions, and encouraging them to join; at least once the representative told the boys that anyone could join.

In August 2000, petitioners appealed the district's denial of their complaint to the superintendent, asserting that the district's application of its policy to the Boy Scouts violates ORS 659.850, which provides:

"(1) As used in this section, 'discrimination' means any act that unreasonably differentiates treatment, intended or unintended, or any act that is fair in form but discriminatory in operation, either of which is based on age, disability, national origin, race, marital status, religion or sex.

"(2) No person in Oregon shall be subjected to discrimination in any public elementary, secondary or community college education program or service, school or interschool

activity or in any higher education program or service, school or interschool activity where the program, service, school or activity is financed in whole or in part by moneys appropriated by the Legislative Assembly.

"(3) The State Board of Education and the State Board of Higher Education shall establish rules necessary to insure compliance with subsection (2) of this section in the manner required by ORS chapter 183."

The superintendent considered the appeal in accordance with the procedures that the state Board of Education (board) had previously established in OAR 581-021-0049, which provides, in part:

"(1) Districts shall adopt written procedures for the prompt resolution of complaints of discrimination. Persons may, after exhausting local grievance procedures or 90 days (whichever occurs first) appeal in writing to the Superintendent of Public Instruction. The Superintendent shall review the local school district procedures and findings of fact to determine if proper procedures were followed and what action if any shall be taken. In making this determination, the Superintendent may decide:

"(a) No substantial evidence exists for the charges of discrimination, and no further action will be taken;

"(b) Discrimination may exist, and conciliation will be attempted to reach agreement by both parties.

"(2)(a) If conciliation fails to resolve the parties' differences within 30 days, the Superintendent shall promptly establish a date for a hearing on the complaint. Said hearing shall be conducted within 30 days of failure of conciliation unless both parties agree to an extension of the period. The hearing shall be conducted in accordance with provisions of Oregon's Administrative Procedures Act.

"(b) In conducting a hearing required by this rule, the Superintendent of Public Instruction shall determine if a local district is in compliance with the provisions of ORS [659.850]."

Under OAR 581-021-0049, thus, the superintendent's responsibility is first to review the district's procedures and findings of fact to determine both whether the district followed proper procedures and what, if any, action the

superintendent should take. Those actions depend on the evidence. If there is not substantial evidence to support the charges of discrimination, the superintendent will take no further action. If discrimination may exist, the superintendent will conduct conciliation in an attempt to reach agreement by both parties and will proceed to a contested case hearing if conciliation is unsuccessful.

In this case, after reviewing the record, the superintendent concluded that there was no substantial evidence of discrimination and declined to take any further action. Because the superintendent's decision was an order in other than a contested case, petitioners sought judicial review in the circuit court. ORS 183.484(1). As part of conducting the judicial review, that court received evidence in addition to what was in the record before the superintendent. As noted, it concluded that the superintendent abused his discretion in determining that there was no substantial evidence of discrimination and remanded the case to the superintendent for further action on the complaint in accordance with OAR 581-021-0049. Respondents appeal.

■ The trial court's review was for substantial evidence and errors of law, ORS 183.484(5), and we review the trial court's decision to determine whether it correctly applied its standard of review. *Powell I*, 185 Or App at 338-39; *Harris v. Board of Higher Education*, 145 Or App 477, 478, 930 P2d 873 (1996). In practical effect, that means that we review the agency's order for compliance with the standards set out in ORS 183.484(5). *See Norden v. Water Resources Dept.*, 158 Or App 127, 136, 973 P2d 910 (1999), *aff'd*, 329 Or 641, 996 P2d 958 (2000). We discuss the nature of our review in greater detail later in this opinion.

■ Respondents first argue that petitioners do not presently have standing to challenge the district's policies. They point out that Remington no longer attends Harvey Scott Elementary School and that the school that he attends is not one of the schools where the Boy Scouts currently makes presentations. ORS 183.480(1) provides that a person seeking judicial review of a final order of an agency must be "adversely affected or aggrieved" by the order. We have held that a petitioner must also show that the court's decision will

have a practical effect on the petitioner's rights. *See Powell I*, 185 Or App at 346.

Contrary to respondents' arguments, we have already decided the standing issue in petitioners' favor. Remington changed schools before our decision in *Powell I*, and in that case we discussed petitioners' standing as a result of the change. Although some of our discussion was based on concerns that were specific to the constitutional issues involved in that case, we also held that Nancy had standing as the mother of a student in the district to seek declaratory and injunctive relief.

> "Granted, her son no longer attends a school in which the Boy Scouts engages in membership activities. But neither the district's policies nor the Boy Scouts' ability to pursue school membership activities pursuant to those policies at any school in the district [has] changed. The Boy Scouts' voluntary limitation of its activities, without more, does not render moot plaintiff's challenge to the district's policies. Moreover, as long as the district's policies remain in place, and as long as the Boy Scouts remains active in other schools within the district, plaintiff is confronted with a classic Hobson's choice: she must either subject her child to unwelcome and allegedly unconstitutional religious activity or she must restrict her choice of schools for her son to those in which the Boy Scouts declines to recruit. * * * Either choice provides her with a concrete stake in the litigation such that, if her claim has merit, a judicial resolution will have a practical effect on her rights and interests."

*Id.* at 352-53 (citation omitted).

Our discussion of the practical effect of the district's policy on Nancy for the purpose of declaratory and equitable relief applies equally to the practical effect of that policy on Nancy and Remington for the purpose of seeking judicial review of the superintendent's order. If the district's policies remain in effect, their choice of schools will be affected because they will either have to subject Remington to what they assert is an illegal discriminatory policy or place him in a school where the Boy Scouts, for the moment, does not recruit. We decline the superintendent's invitation to reconsider that analysis. Petitioners have standing.[5]

---

[5] For the same reason, petitioners' claim is not moot even though Remington is now attending high school. The guidelines apply to all of the district's schools, and

■ Respondents also assign error to the court's ruling permitting petitioners to introduce evidence in addition to what was in the administrative record. They acknowledge that, in *Norden*, the Supreme Court held that a proceeding in the circuit court for judicial review of an order in other than a contested case includes an opportunity to develop the record beyond what was before the agency at the time it made its decision. 329 Or at 647-49. They argue that that holding does not apply to this case because petitioners had an opportunity to present evidence to the superintendent and, in fact, did so. However, in *Norden* the court held that the legislature intended ORS 183.484 to provide parties an opportunity during the judicial review proceeding in the trial court "to develop a record like the one that parties are entitled to develop at an earlier stage in a contested case proceeding." *Id.* at 649. The proceeding before the superintendent was not a contested case, and petitioners did not have all of the opportunities to develop the record that they would have had in a contested case. The extent to which they did develop, or could have developed, the record before the superintendent may affect the trial court's exercise of its discretion in determining what additional evidence to admit, but it does not turn the trial court proceeding into judicial review of a contested case. The trial court did not err.[6]

■ We turn to the merits of the trial court's decision. In their third assignment of error, respondents argue that the trial court erred in determining that the superintendent abused his discretion in concluding that the district acted appropriately, that there was no substantial evidence of discrimination, and that he would take no further action. Respondents first assert that the trial court erred in reviewing the superintendent's decision for abuse of discretion rather than for substantial evidence. As previously stated, the circuit court reviews an order in other than a contested case under ORS 183.484. As pertinent here, it determines whether substantial evidence supports the agency's factual findings. In addition, it also determines, as a matter of

high school principals have the discretion to permit the same Boy Scouts activity that elementary school principals permitted.

[6] In any case, the additional evidence that petitioners presented is not essential to our decision.

law, whether the agency "has erroneously interpreted a provision of law" or has exercised its discretion "[o]utside the range of discretion delegated to the agency by law." ORS 183.484(5)(a) - (c).

On appeal, we review the circuit court's determinations in those regards to determine if it correctly assessed the agency's actions under those standards. As to factual issues, the question is whether the order was supported by substantial evidence. *Cf. Powell I*, 185 Or App at 339 (appellate court reviewed order to determine whether circuit court correctly decided that order was supported by substantial evidence). As to legal issues, we review the agency's order to determine whether the agency correctly carried out its duties, functions, and powers under the relevant organic statutes and rules, as well as under any other applicable law. In this case, the issues were primarily legal, and review of the superintendent's action is therefore for errors of law, rather than for abuse of discretion. We modify the trial court's order in that respect.

We turn to the relevant provisions and to the superintendent's order applying them in this case. Pursuant to ORS 659.850(3), the board has adopted OAR 581-021-0045(3), which provides:

" 'Specific Prohibitions': In providing programs or services to students, a school district shall not, on a discriminatory basis as defined in subsection (1)(a) of this rule:

"(a) Treat one person differently from another in determining whether such person satisfies any requirement [or] condition for the provision of such aid, benefit, or service;

"(b) Provide different aid, benefits, or services; or provide aids, benefits, or services in a different manner;

"(c) Deny any person such aid, benefit, or service;

"(d) Subject any person to separate or different rules of behavior, sanctions, or other treatment;

"(e) Aid or perpetuate discrimination by joining or remaining a member of any agency or organization which discriminates in providing any aid, benefit, or service to students or employees;

"(f) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity."

Thus, ORS 659.850 establishes a standard for what conduct by a public educational entity constitutes discrimination, prohibits such discrimination, and requires the board to establish rules to ensure compliance with that prohibition. In turn, OAR 581-021-0045(3) lists specific actions that can constitute discrimination. Finally, OAR 581-021-0049 requires school districts to adopt written procedures for the prompt resolution of written complaints of discrimination and sets out standards and procedures by which the superintendent must review a school district's action on a particular complaint.

Under the board's rules, the superintendent's task was to determine whether there was substantial evidence of discrimination, *not* whether the district actually discriminated. Stated differently, the issue that he decided was only whether "the record, viewed as a whole, would permit a reasonable person" to find that the district discriminated. ORS 183.484(5)(c).[7] The superintendent, following the formulation provided in OAR 581-021-0049(1), determined that "[n]o substantial evidence exist[ed] to support the charges of discrimination" as defined in ORS 659.850 and that, accordingly, no further action was required. The superintendent made no factual findings of his own, and factual findings are irrelevant to his decision. Whether substantial evidence exists involves evaluating the evidence for its legal sufficiency.

We turn, then, to the relevant legal question, whether the superintendent correctly determined that there is no substantial evidence that the school district subjected petitioners to discrimination within the meaning of ORS 659.850. That statute itself defines discrimination as "any act that unreasonably differentiates treatment," whether intentionally or unintentionally. In addition, OAR 581-021-0045(3) sets out examples of discriminatory conduct that the board has determined to be unreasonable. Here, the parties

---

[7] The administrative rules do not define "substantial evidence." We therefore use the definition that otherwise applies in Oregon administrative law.

do not dispute that the Boy Scouts discriminates within the meaning of that statute and rule, that Boy Scouts representatives acted at Remington's school in the ways that petitioners describe, and that they acted at other schools in the ways shown on the videotapes. The parties also do not dispute that the guidelines currently permit Boy Scout recruitment during school hours and with district assistance. In his order, the superintendent recognized those facts but reasoned that the district's actions did not discriminate against Remington on the ground of religion because

> "the law and rules prohibit discrimination in education programs and services or school or interschool activities funded by the state. The law and rules do not provide a blanket prohibition that guarantees that everything said and done or occurring at school will be discrimination free or that the school will insure that all outside contacts will be with persons or organizations that are free of discrimination."

The superintendent reasoned in part that a school district is liable under Title IX of the Educational Amendments of 1972, 20 USC § 1681, only for its own misconduct. He also reasoned that an issue of the school newsletter announcing the Cub Scout open house

> "was available to all students on a nondiscriminatory basis. * * * While Boy Scout *membership* is apparently not open to all students, membership is not a public school program, service or activity. Thus, the Boy Scout membership policies—which apparently excludes [*sic*] atheists and gays—standing alone do not amount to discrimination in a public school program, service or activity in violation of ORS [659.850]."

(Emphasis in original.)

The superintendent also considered whether allowing a private organization that included a religious requirement to have access to school facilities constituted discrimination under ORS 659.850. On that issue, he relied on United States Supreme Court decisions that a school could not prevent a private religious organization from using school facilities after hours, citing *Good News Club v. Milford Central*

*School*, 533 US 98, 121 S Ct 2093, 150 L Ed 2d 151 (2001), and that a school district is liable for a third party's discrimination under Title IX only in limited circumstances, citing *Davis v. Monroe County Bd. of Ed.*, 526 US 629, 119 S Ct 1661, 143 L Ed 2d 839 (1999). He stated that there was no discrimination under those tests:

> "The school district does not exercise any control over the Boy Scout membership policies. Allowing the Boy Scouts to have access to school newsletters and facilities in the manner that occurred here was not so pervasive as to deprive the complainant of access to any educational opportunities or benefits. And in light of the adoption of the September 14, 2000 guidelines limiting access (and prohibiting the type of activities that were of concern to complainant in 1996 and 1997), it cannot be said that the school district's actions amounted to 'deliberate indifference.' "

Finally, the superintendent concluded that any differential treatment by the district was not unreasonable and therefore was not prohibited discrimination under ORS 659.850. The superintendent concluded that there was educational value in engaging the school with community organizations:

> "Notifying students of activities of the Boy Scouts or other organizations does not make the school a sponsor, partner[,] or agent of those organizations. The school obviously saw more value than harm in the notification and opportunity, and ORS [659.850] simply does not make that choice unlawful."

The dissent reasons that it was appropriate for the superintendent to rely on federal cases, noting that we have previously suggested that the board should consider federal cases based on a federal anti-discrimination statute in resolving an issue of discrimination. 198 Or App at (Landau, J., dissenting) (citing *Montgomery v. Board of Education*, 188 Or App 63, 79, 71 P3d 94 (2003)). The problem with the dissent's reasoning is that, in contrast to the situation in *Montgomery*, the federal cases on which the superintendent relied were, at

best, only tangentially related to the issues in this case. We conclude that, in relying on those cases, the superintendent evaluated the district's action by the wrong standard.

In *Good News Club*, the plaintiff asserted that a school district's rule that prohibited after-hours use of school property for religious worship violated the plaintiff's First Amendment right to free speech. The Court agreed, holding that the district had created a limited public forum at the school and that prohibiting the expression of views because of their religious nature was impermissible viewpoint discrimination. 533 US at 107. The Court rejected the district's argument that its action was necessary to avoid violating the Establishment Clause of the First Amendment. Rather, the Court pointed out that the plaintiff's meetings were held after school hours, were not sponsored by the school, and were open to any student who obtained parental consent, not just club members. *Id.* at 113. Thus, allowing the club to speak on school grounds would ensure the district's neutrality, not threaten it. Because the students needed a parent's permission in order to attend, they could not be coerced into doing so and they would not perceive the school as sponsoring the program. *Id.* at 115.

The issue in *Davis* was whether the school district's failure to protect a student from sexual harassment by another student gave rise to a claim against the district for money damages under Title IX of the Education Amendments of 1972, 20 USC § 1681. The conduct allegedly continued over a period of many months. The student and her mother reported it to several teachers, who reported it to the principal, but the school took no disciplinary action against the offending student. The harassment stopped only when the student pleaded guilty to sexual battery. *Davis*, 526 US at 633-35. Title IX prohibits education programs or activities that receive federal funds from excluding any person from participation in, denying the benefits of, or subjecting a person to discrimination in those programs or activities on the basis of sex. 20 USC § 1681(a). That prohibition is an exercise of Congress's spending power, a fact that was the focus of the Court's decision. A district could be liable for money damages only if Congress's intent that it be liable was so clear that the

liability was part of the contract to which the district agreed when it accepted the money. *Davis*, 526 US at 640.

The Court concluded that the district could be liable under Title IX for the acts of the student only if the district's own deliberate indifference to the student's misconduct caused the discrimination. It discussed what was necessary to meet that standard at some length. *Id*. at 640-46. Because the statute prohibits discrimination that would lead to a student being excluded from participation in or denied the benefits of the relevant educational program, the Court concluded that

> "funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."

*Id*. at 650. That strict standard, thus, was the result of a combination of the limitations of Congress's spending power and the fact that the district had not directly engaged in misconduct but had only failed to stop the misconduct of a third party.

Although *Good News Club* involved access to school property and *Davis* involved discrimination by a school district, the differences between those cases and this case make their analyses largely inapplicable here. Again, in *Good News Club*, the Court emphasized that the district had created a limited public forum, that the club intended to meet after school hours, that it required parental permission to attend, and that students would not perceive the school as sponsoring the program. In addition, the case involved a constitutional claim of free speech, not a statutory right to be free from discrimination. In *Davis*, the issue was whether the school had discriminated by failing to stop a third-party student from sexually harassing other students, not whether it had participated in any discriminatory action on its own. In addition, the fact that the antidiscrimination statute was part of Congress's exercise of its spending power required the Court to create a very narrow basis for the district to be liable

in money damages that would not have applied to a general antidiscrimination statute.

In contrast to those cases, ORS 659.850 does not merely prohibit the district from acting with deliberate indifference, nor is it limited to actions that deprive Remington of any access to educational opportunities or benefits.[8] Rather, the statute prohibits *any* discrimination on the basis of religion in *any* school program or service or in *any* school or inter-school activity. Although it applies to recipients of state funds, there are no spending power limitations on its scope. The relevant dictionary definitions of "activity" include "natural or normal function or operation" and "an occupation, pursuit, or recreation in which a person is active." *Webster's Third New Int'l Dictionary* 22 (unabridged ed 2002). There is substantial evidence that the Boy Scouts' current recruiting efforts take place during school hours, at a location where the district requires the students to be, and begin with a district representative telling the students to be quiet and, in most cases, to listen to the Scout recruiter. For the students to be in a lunch room at lunch time is a normal school function, as is their listening to a district employee or their being on the school grounds after lunch and before classes resume. In that context, the recruiter's action of remaining on the school grounds after his presentation in order to talk with interested students, while continuing to use the authority of the district to facilitate recruiting, is a continuation of that school activity. In short, there is substantial evidence that, by giving the Boy Scouts representatives access to students in these circumstances, the district itself offered the Scouting program to those students. That is, in itself, a school activity.

In short, the factual and legal issues in this case are not limited to permitting a discriminatory organization to use school facilities before or after school hours in order to conduct the organization's programs in a way that did not suggest school sponsorship. Thus, the superintendent's reliance on *Good News Club* is misplaced.[9] The issues also do not

---

[8] The dissent suggests that *Good News Club* and *Davis* interpreted the statute on which ORS 659.850 was based. 198 Or App at 58-59 (Landau, J., dissenting). As our discussion indicates, that suggestion is incorrect.

[9] For the same reason, the Boy Scouts of America Equal Access Act, 20 USC § 7905, which respondents first mentioned at oral argument, does not apply to this

involve whether the district was deliberately indifferent to one student's sexual harassment of another or the establishment of the criteria for the victim of the harassment to receive money damages based on Congress's exercise of its spending power. Thus, the superintendent's reliance on *Davis* is also misplaced. Rather, the issue is whether there is substantial evidence that the district's actions constituted discrimination under ORS 659.850, that is, whether the district subjected Remington to an "act that unreasonably differentiates treatment, intended or unintended, * * * based on * * * religion * * *." That is also a different question from whether the district violated constitutional standards by itself promoting a religious message, which we held in *Powell I* it did not.

In *Powell I*, we applied ORS 327.109, which provides a procedure for a complaint that a school district "sponsors, financially supports or is actively involved with religious activity." We held that that statute adopted the three-part test for resolving Establishment Clause-type claims that the Supreme Court set out in *Eugene Sand & Gravel v. City of Eugene*, 276 Or 1007, 558 P2d 338 (1976), *cert den*, 434 US 876 (1977). *Powell I*, 185 Or App at 358. That test required us to determine the following: "(1) Does the district's policy reflect a secular purpose? (2) Is the primary effect of that policy to advance or inhibit religion? (3) Does the administration of the policy excessively entangle the district in religion?" *Id.* at 360. We concluded that none of the prongs was satisfied and therefore affirmed the circuit court's decision in favor of the superintendent. *Id.* at 366. It is apparent that, although the facts in *Powell I* are essentially the same as the facts in this case, the issues in the two cases have little in common. The question before us is not whether the district has established a religion by its relationship with the Boy Scouts; rather, again, the question is whether there is substantial evidence that the district subjected Remington to discrimination in a school activity. We turn to that question.

---

case. The act requires schools that receive federal money to provide equal access to the Boy Scouts and certain other groups so that they may conduct meetings before or after the hours when attendance is compulsory. That is not the situation at issue here.

In concluding that there was no substantial evidence that the district's actions constituted discrimination under the statute, the superintendent stated that there is no guarantee that everything that occurs at school will be discrimination-free[10] and that notifying students of Boy Scouts activities does not make the district a partner of the Scouts. Those statements demonstrate that the superintendent did not adequately consider either the scope of the district's obligation to prevent discrimination or the extent to which a factfinder could determine that the district's actions connected it to the Scouts and its discriminatory practices. The guidelines permit school administrators to give the Scouts and other organizations direct access to students, at a time when the students are a captive audience, in order to promote their programs without regard to whether the programs practice discrimination that the statute forbids the district from practicing on its own. By permitting administrators to use the school's authority so to aid a discriminatory organization, they allow the school to offer an activity to students that is not available to all students without discrimination.

There is substantial evidence that, by giving the Scouts the access that it does, the district treats those students who are eligible to join the Scouts differently from those who are not. All students must listen to the introductory presentation, but only those students who meet a religious test may accept the invitation to join. Because eligibility to join the Scouts depends on religious belief, there is substantial evidence that the district thus subjects persons to differentiated treatment in a school activity on the ground of religion.

The dissent disagrees, in part because it concludes that any discrimination to which the district subjected persons did not occur "in" a school activity. The dissent incorrectly treats petitioners' statement that the discrimination is manifest at a later time rather than during the presentation itself as a concession that the dissent's conclusion is correct.

---

[10] That statement is inconsistent with the express requirement in ORS 659.850(2) that "[n]o person in Oregon" shall be subjected to discrimination in any school program, service, or activity. Contrary to the superintendent's position, the legislature *has* expressly required that everything that occurs at a school that receives state funds be free of discrimination.

198 Or App at 63 (Landau, J., dissenting). Petitioners made no such concession. District support of a discriminatory act can be discrimination by the district *in* a school activity even if the discriminatory act takes place after the district's support has occurred. The word "in" is a preposition that shows relationships. *Marcilionis v. Farmers Ins. Co.*, 318 Or 640, 645, 871 P2d 470 (1994). "In" is sometimes used as a function word " 'to indicate location or position in space or in some materially bounded object.' " *Id.* (quoting *Webster's* at 1139). It also can mean "in the course of," thus suggesting a temporal connection. *Webster's* at 1139. However, its use is not limited to the description of spatial or temporal relationships. It also can be used as a function word to "indicate close connection by way of implication or active participation." *Id.* That meaning captures the sense in which the district here subjected Remington to differentiated treatment in a school activity; the precipitating conduct—Scout recruitment—occurred at school and in the course of a school activity, even though the ultimate impact of that conduct—the exclusion of Remington from membership in the Scouts—did not occur at the same place and time. Any other interpretation of the statute would create a formalism that would foster almost endless loopholes that would permit the district to discriminate indirectly while nominally keeping its hands clean. Accordingly, we reiterate our conclusion that there is substantial evidence that the district subjected students to differentiated treatment *in* a school activity on the ground of religion.

■ The dissent, in effect, accuses us of cherrypicking an obscure dictionary definition of "in" to reach a result that the legislature did not intend. 198 Or App at 64-65 (Landau, J., dissenting). We reject that characterization. The fact that "in" is a function word that conveys a broad array of possible meanings does not require us to infer that the legislature intended only a limited subset of those meanings to apply to its use of the word. It is not uncommon for the legislature to use a word in its broad sense where the circumstances to which it is intended to apply also are broad. *See, e.g., State v. Branstetter*, 332 Or 389, 403, 29 P3d 1121 (2001) (citing *State ex rel Gattman v. Abraham*, 302 Or 301, 311, 729 P2d 560 (1986), for the proposition that " 'cause' was chosen by [the] legislature because 'it has a broad meaning and may include

a case or proceeding or any part thereof depending upon the circumstances' "). In that regard, our conclusion that "in" should be given a broad meaning in ORS 659.850 is not "acontextual." 198 Or App at 64-65 (Landau, J., dissenting). To the contrary, the dissent's discussion of "in" reflects a formulation that would permit the district to engage in discrimination in activities it promoted simply by having the manifestation of the discrimination occur off district grounds. Unlike the dissent, we conclude that discrimination may occur "in" a school activity when that activity includes recruitment for an organization that discriminates, even if the discrimination becomes manifest at a later time. There is no practical difference between encouraging a student to sign up during a school activity, knowing that the student subsequently will be rejected for a discriminatory reason, and preventing the student from signing up in the first place. The first option is just as likely to harm the student in ways that the legislature intended to prevent.

■ Under the statute, differentiation in treatment that is based on religion constitutes unlawful discrimination unless the differentiation is reasonable.[11] The superintendent's discussion of the reasonableness of the district's actions in this case, assuming that it subjected Remington to differential treatment, was limited:

> "Whether it is good policy to give the Boy Scouts access to public school newsletters and facilities is certainly open to debate, but that policy decision is for the school district, not the Superintendent to decide. The Superintendent's review is limited to determining whether the school district subjected complainant to discrimination within the meaning of ORS [659.850]. Under the circumstances presented here, the Superintendent concludes that printing notice of a Cub Scout meeting[ ] in the school newsletter, and allowing the Boy Scouts to make the type of informational presentations

---

[11] The analysis that we apply to this case is identical to the analysis that we would apply if the school district were to permit the youth auxiliary of the Ku Klux Klan to make presentations at the school so long as it did not refer to limiting participation to white Protestants. Given the history of this state during the 1920s, that hypothetical is not entirely farfetched. *See Pierce v. Society of Sisters,* 268 US 510, 45 S Ct 571, 69 L Ed 1070 (1925). We doubt that, in that situation, either the superintendent or the dissent would fail to find substantial evidence that the district discriminated against racial minorities, Catholics, Jews, and Muslims.

that occurred here, did not unreasonably subject complainant to differential treatment in any public school program, service, or activity.

"The school district has concluded there is educational value in engaging the school with community organizations that provide youth resources. State law encourages school and community connections. *See* ORS 329.025(7) (12) (13), 329.125; 332.172(1)(b); 336.067; 336.177; 336.510; 338.015."

In sum, the bases for the superintendent's conclusion that any differentiation in treatment was reasonable were that (1) the school district made a policy decision; (2) its decision was consistent with state law encouraging public school and community connections; and (3) apparently, that any differentiation was limited in character. Those reasons are not sufficient, either individually or in combination, to justify the conclusion that no substantial evidence of discrimination exists. A policy decision to permit discrimination would violate ORS 659.850, as would encouraging discriminatory public school and community connections. The fact that the differentiation is limited in character may affect its impact but does not make it any less discriminatory.

The superintendent's reasonableness analysis must stand or fall with the validity of the idea that community organizations that provide youth resources should be allowed to recruit students with school support during school hours in school activities even if those organizations discriminate in ways that the statute would prohibit if the district did it directly. At the heart of his reasoning appears to be the premise that the public schools cannot reasonably be expected to protect children from the inevitable psychosocial bumps and bruises that occur in daily life. That premise misses the point. The purpose of ORS 659.850, like that of other anti-discrimination statutes, is to prevent children from receiving bumps and bruises from the school itself that are based on their membership in a group that, the legislature has decided, is an impermissible basis for differentiation. There is substantial evidence that this is not a case of playground scuffles but of the district promoting an organization that

rejects Remington's participation on a ground that would violate the legislature's *determination of* public policy if the district had applied it directly. To treat such activity as no different from exposing children to the normal pains of growing up trivializes the legislature's action and condescends to those whom it acted to protect.

The record contains undisputed evidence that, after being told that they cannot join the Boy Scouts for religious reasons, young children, including Remington, feel ostracized by their peers. The record, and common sense, teach us that such reactions are neither idiosyncratic nor trivial.

> "Parents and lawmakers may and do assume that the hours, days, and years spent in school are the time and the place when a young person is most impressionable by the expressed and implicit orthodoxies of the adult community and most sensitive to being perceived as different from the majority of his or her peers; famous constitutional cases have involved this socializing rather than intellectual function of the schools."

*Cooper v. Eugene Sch. Dist. No. 4J*, 301 Or 358, 376, 723 P2d 298 (1986), *appeal dismissed*, 480 US 942 (1987).

The Board of Education has not expressly adopted rules concerning criteria for determining whether differentiation is reasonable. However, the rules that it has adopted prohibit actions that "[a]id or perpetuate discrimination by joining or remaining a member of any agency or organization which discriminates in providing any aid, benefit, or service to students or employees," OAR 581-021-0045(3)(e), or that "[o]therwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity," OAR 581-021-0045(3)(f). Those rules indicate that the board generally considers differentiation on prohibited grounds to be unreasonable. In all events, those rules support the conclusion that substantial evidence of discrimination exists. The fact that the superintendent may believe that the Boy Scouts generally plays a constructive role in the development of youth character does not alter that conclusion. The same might be said for any number of discriminatory organizations.

Our conclusion should not be taken to suggest that discriminatory organizations such as the Boy Scouts may

not, under any circumstances, be permitted to conduct recruiting or other programs on school premises. Here, however, the district's policy authorizes school administrators to provide practical support for such programs during school activities for which student attendance and attention are mandatory. In those circumstances, there is substantial evidence from which, under the applicable statutes and rules, a reasonable factfinder could determine that the differentiated treatment to which the school district subjects school children by virtue of the Boy Scouts' recruitment activities is unreasonable. The superintendent therefore erred in concluding that there is no substantial evidence that the district discriminated. We affirm the trial court's order to that effect and, as did the trial court, remand to the superintendent for further proceedings under OAR 581-021-0049(1)(b).

■ Respondents' final assignment of error is that the trial court erred in awarding attorney fees to petitioners. On appeal, they do not challenge the amount of the awards. The trial court relied on both ORS 183.497 and ORS 20.107 to support its award against the department and on ORS 20.107 to support its award against the district. We first discuss the award under ORS 183.497. That statute provides that the reviewing court may award attorney fees to a prevailing petitioner on judicial review of an agency's final order, ORS 183.497(1)(a), and that it shall do so if it finds that the agency acted without a reasonable basis in fact or law, unless the agency shows that its action was substantially justified or that there are special circumstances that would make an award unjust, ORS 183.497(1)(b). We recently discussed the statute in *Kaib's Roving R.Ph. Agency v. Employment Dept.*, 189 Or App 579, 77 P3d 327 (2003), *rev allowed,* 336 Or 615 (2004) (*Kaib's*). We first held that the criteria in ORS 20.075 for discretionary awards of attorney fees are substantially identical both to the criteria that we had previously established for awards under the predecessor to ORS 183.497(1)(a) and to the criteria for nondiscretionary awards under ORS 183.497(1)(b). We therefore applied the same criteria to both subsections of the statute in *Kaib's* and do so again here. *Id.* at 586-87.

Respondents first argue that the trial court's decision was not in favor of petitioners because the court's order

only required the superintendent to conduct further proceedings. In *Kaib's*, we held that the petitioner prevailed when we reversed the agency's order and remanded for a new order before a new decision-maker. *Id.* at 585-86. In this case, the superintendent in his final order refused to take any further action on petitioners' complaint. As a result of the judicial review, the superintendent must now proceed to conciliation and, if necessary, a contested case hearing and must do so under a substantially altered view of the law. The trial court's decision was in favor of petitioners.

The crucial issue is whether the superintendent acted without a reasonable basis in fact or in law. In *Kaib's*, the agency director issued a final order in a case in which the director had no authority to do so. Rather, the applicable statute required that a hearing officer issue the final order and gave the director only the status of a party to the proceeding. We therefore vacated the director's order and remanded the case for a new decision by a hearing officer who was not involved with the previous decision. Despite that decision on the merits, we held that the agency had not acted without a reasonable basis in fact or law and refused to award attorney fees. We held that the agency had not misconstrued the applicable statutes but had failed to discern that they applied at all. Because the petitioner had not based its arguments on those statutes but, instead, on the federal constitution, the agency's failure was not unreasonable. *Id.* at 588-89.

In this case, the parties knew which statute applied, and we have held that the superintendent misconstrued it. His error lay primarily in relying on federal principles that apply to some forms of discrimination in educational programs rather than focusing on the specific state statute that was at issue. Although the superintendent failed to understand why the principles on which he relied did not apply to this case, it was not unreasonable for him to look to them for guidance, particularly in light of the absence of relevant authority under the statute. As we said in *Kaib's*, in

> "deciding whether to award attorney fees against an agency that has erroneously *construed* a controlling statute, 'the correct approach is to consider not only the meaning of the

statute, as determined by the court, but also all the surrounding circumstances that help to explain whether the department's erroneous statutory construction was the result of a reasonable mistake.' "

*Id.* at 588-89 (quoting *Preble v. Dept. of Rev.*, 331 Or 599, 603, 19 P3d 335 (2001)) (emphasis in *Kaib's*). In this case, the superintendent made a reasonable mistake, and ORS 183.497(1), therefore, does not support the award of attorney fees against the department.

 The trial court also relied on ORS 20.107(1) to support its award of fees against both the department and the district. That statute requires a court to award attorney and expert witness fees to a prevailing plaintiff in a civil judicial proceeding, including judicial review of an administrative proceeding, that is based on a claim of unlawful discrimination.[12] However, petitioners did not follow the procedural requirements for seeking an award of attorney and expert witness fees under ORS 20.107, and the trial court therefore erred in awarding them.

ORCP 68 C(2)(a) provides that a "party seeking attorney fees shall allege the facts, statute, or rule which provides a basis for the award of such fees in a pleading filed by that party." According to the rule, the consequence of failing to follow that procedure is clear: "No attorney fees shall be awarded unless a right to recover such fee is alleged as provided in this subsection." *Id.* Petitioners did not refer to attorney fees in the body of their petition for review, but in the prayer they asked the court to "[a]ward petitioners their attorneys' fees and costs pursuant to ORS 183.497[.]" Neither they nor respondents referred to ORS 20.107 until petitioners did so in the statement for attorney fees that they filed after the trial court's decision on the merits.

We have recognized that there is some flexibility in the rule for pleading a right to attorney fees; the stringent mandate of ORCP 68 C "is tempered by ORCP 12 B, which

---

[12] ORS 20.107(3) specifically contemplates an award against a state agency or officer. Because of the basis for our decision, we do not need to decide whether that provision authorizes an award against an agency that simply acts as a neutral decision-maker in resolving a claim of discrimination by a third party.

directs the court to 'disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party.'" *Lumbermen's v. Dakota Ventures*, 157 Or App 370, 375, 971 P2d 430 (1998). Thus, we have permitted a request for fees in the prayer of a pleading rather than in the body of the pleading itself. *Little Whale Cove Homeowners Assoc. v. Harmon*, 162 Or App 332, 342, 986 P2d 616 (1999).

In *Domingo v. Anderson*, 138 Or App 521, 910 P2d 402 (1996), *rev'd in part on other grounds*, 325 Or 385, 938 P2d 206 (1997), the plaintiffs filed a complaint that asserted various claims but did not allege a breach of contract. In his answer, the defendant alleged a right to attorney fees under ORS 20.105 (1993), which at the time required a showing of bad faith. The plaintiffs then filed an amended complaint that alleged a breach of contract claim and sought attorney fees under the contract. The defendant responded with a motion for summary judgment. After the court granted that motion, he amended his answer to include a request for attorney fees under the contract. We held that, because the defendant's original answer alerted the plaintiffs that he would seek attorney fees on some theory, and because the plaintiffs themselves asserted a right to attorney fees under the contract, the plaintiffs were necessarily aware that they would be liable for attorney fees if they proved the existence of a contract but failed to prove a breach. *Id.* at 527.

The Supreme Court recently made it clear that the leeway that we have provided in those cases is not unlimited. ORCP 12 B applies only when the party has attempted to comply with the requirements of the rule; it cannot be used as an escape from those requirements. Thus, a defendant who files a motion for summary judgment before answering must comply with ORCP 68 C(2)(b) and include a request for attorney fees in the motion; a request in a supporting memorandum is insufficient. The failure to allege, or to attempt to allege, a right to attorney fees in the motion means that there was no error or defect in the motion that the trial court could disregard under ORCP 12 B. *Mulier v. Johnson*, 332 Or 344, 350, 29 P3d 1104 (2001).

In this case, petitioners did not allege a right to attorney fees under ORS 20.107, and there is nothing in what they did allege that suggests that they were attempting to assert a right under that statute. Nothing else in anything that petitioners filed alerted respondents that petitioners would seek attorney fees under ORS 20.107. Unlike in *Domingo*, there also was nothing that respondents filed that might indicate that they should have been aware of the possibility of an award of attorney fees under that statute. In short, there is nothing in the pleadings or motions that supports an award of attorney fees under ORS 20.107. The trial court erred in awarding attorney fees based on that statute.

■ The final issue is petitioners' cross-appeal, in which they assign error to the trial court's action in remanding the case to the superintendent for conciliation and, if necessary, a contested case hearing in accordance with OAR 581-021-0049. They argue that there is uncontradicted evidence that Remington was subjected to discrimination and that the court should have reversed the superintendent's order outright and entered judgment that the district had violated ORS 659.850. The problem with petitioners' argument is that it goes beyond the scope of a court's authority on judicial review of an agency order. OAR 581-021-0049 establishes a procedure for the superintendent to follow in considering a complaint of discrimination. The superintendent followed the rule but reached the wrong decision, leading him to terminate the proceeding prematurely. The court cannot now tell the superintendent to ignore the rule; rather, the superintendent must follow the procedure that the rule establishes. The court's authority is to set aside or modify the agency's order or to remand the case for further action if the agency has erroneously interpreted the law, ORS 183.484(5)(a), to remand the case if the agency's exercise of discretion is outside of its legal range or otherwise incorrect, ORS 183.484(5)(b), or to set aside or remand the order if it is not supported by substantial evidence in the record, ORS 183.484(5)(c).

In the current posture of this case, none of those provisions provides authority to a court to order the superintendent to find certain facts or to take any action other than to proceed in accordance with the rule in light of the law as the

court has declared it. Among other things, the superintendent may now actually have to find facts rather than simply determining whether there is substantial evidence to support a potential factual finding. The cross-appeal does not identify any error in the trial court's action.

On appeal, paragraph 2 of judgment modified to delete "abuse of discretion" and insert "error of law"; award of attorney fees reversed; otherwise affirmed. Affirmed on cross-appeal.

**LINDER, J.,** concurring.

I join in the majority's legal analysis and disposition of this case. I write separately to clarify my understanding of the task left to the superintendent, given the procedural posture of the issue.

ORS 659.850(2) prohibits discrimination in any program or service in a public school. Discrimination, as defined in ORS 659.850(1), means any act that "unreasonably differentiates treatment, intended or unintended" on any of several prohibited grounds, including religion. Under the administrative rules that the board has promulgated to ensure compliance with the prohibition on public school discrimination, the board has established a procedure by which the superintendent first determines whether "substantial evidence" of discrimination exists. OAR 581-021-0049(1). If no substantial evidence of discrimination exists, the superintendent takes no further action. OAR 581-021-0049(1)(a). If there is substantial evidence of discrimination, the superintendent encourages conciliation between the parties; if conciliation fails, the superintendent conducts a contested case hearing to determine whether a school district is in compliance with ORS 659.850(2). OAR 581-021-0049(1)(b), (2)(a).

In testing for substantial evidence in this case, the superintendent was to ask only whether *any reasonable person could conclude,* on the record as a whole, that the school district "unreasonably differentiated" in treatment, intended or unintended, on the basis of religion. *See generally Baker v. City of Woodburn,* 190 Or App 445, 455-56, 79 P3d 901 (2003) (describing the nature of substantial evidence review). In

other words, as the majority correctly states, the superintendent's role in investigating the complaint was only "to determine whether there was substantial evidence, *not* whether the district actually discriminated." 198 Or App at 38 (emphasis in original). The same is true of what we must decide on appeal.

As a result, the scope of our decision is limited. The majority opinion correctly does not conclude that the district has, in fact, actually engaged in unlawful discrimination. Rather, it determines only that there is substantial evidence in the record to reasonably support such a conclusion. That determination has a legal component, one that involves the interpretation of the statute and, in particular, the meaning of the language in ORS 659.850(2) that requires the discrimination to be "in any public elementary, secondary or community college education program or activity[.]" On that point, the majority holds that discrimination "may occur 'in' a school activity when that activity includes recruitment for an organization that discriminates, even if the discrimination becomes manifest at a later time." 198 Or App at 41-42.

The majority's substantial evidence determination also has a factual component. As the majority concludes, the record includes evidence that the Boy Scouts' current recruiting efforts take place during school hours, at a place where the district requires students to be, and at a time when the students, in effect, are a captive audience under the direction, control, and supervision of school officials. Such circumstances provide "substantial evidence" to support a determination that "the district itself offered the Scouting program to those students." 198 Or App at 38. Perhaps reasonable minds can and would differ on whether to draw that conclusion. But for present purposes, that is beside the point. The only question is whether such a conclusion *reasonably could be reached.* Because it could be, the superintendent has an obligation to pursue the complaint.

If the dispute proceeds to a contested case hearing on remand, the superintendent's task will include determining whether any unlawful differentiation in treatment is "unreasonable." In the superintendent's order declining to pursue the complaint further, the superintendent concluded that

any differentiation in treatment by the school district was not unreasonable, apparently as a matter of law.[1] The superintendent reasoned that the district made a policy decision that was consistent with state law encouraging public school and community connections and that any differentiation in treatment was limited in character. The superintendent did not consider the effect of the Boy Scouts' discriminatory practices on students who are turned away from participation in Scouting activities. As the majority describes, the record developed in the circuit court contains evidence that the religious test for membership imposed by the Boy Scouts significantly ostracizes some students. That effect on those students provides substantial evidence to support a conclusion that the district's sponsorship of the recruiting activities results in unreasonable differentiation in treatment. 198 Or App at 44.

An inquiry into "unreasonableness," in many contexts, including administrative ones, often involves questions of both fact and law. *See, e.g., SAIF v. Severson*, 105 Or App 67, 72, 803 P2d 1204 (1990) (Workers' Compensation Board must apply correct legal standard in determining whether refusal to authorize training program was unreasonable; beyond that, the board's decision is tested for substantial evidence). At this procedural point, we appropriately determine only that substantial evidence exists from which a decision-maker reasonably could conclude that the district engaged in unlawful discrimination. The superintendent has not yet held a contested case hearing or made findings based on the record of that contested case. Nor has the superintendent examined the "unreasonableness" of any unlawful differentiation in treatment based on the totality of the circumstances as developed in a contested case. The legal sufficiency

---

[1] Given the "substantial evidence" aspect of the inquiry, the question before the superintendent should have been whether *any reasonable* decision-maker could find the district's activities to be unreasonable discrimination. To answer that question in the negative, the activities would have to be reasonable as a matter of law. The superintendent may have departed from that standard. In his order, he concluded that, "[u]nder the circumstances presented here, * * * [the district's activities] did not unreasonably subject complainant to differential treatment in any pub[l]ic school program, service, or activity." In effect, the superintendent may have slipped into the role of final decision-maker, rather than testing the evidence for substantial evidence. If so, he erred in that regard.

of any determination that the superintendent *may* make on the basis of a fully developed record if a contested case hearing is held is not a matter that we now determine.

For those reasons, and with that clarification, I concur.

**LANDAU, J.,** dissenting.

The principal issue in this case is whether there is substantial evidence that the school district, by permitting representatives of the Boy Scouts of America to make a presentation about the organization's programs during a school lunch period, has subjected students to "discrimination" in an education program or service or in a school or interschool activity within the meaning of ORS 659.850. The key to resolving that issue is the statutory definition of "discrimination": It is an act that "unreasonably differentiates treatment" on the basis of, among other things, religion. ORS 659.850(1). Thus, our task is not to determine whether the district policies that permit such presentations make sense, are good policy, or are detrimental to children. Our task is limited to the narrow matter of determining whether there is evidence that (1) the school district has committed an act that differentiates among students on the basis of religion; and (2) if so, whether there is evidence that the differentiation in treatment occurred in an education program or service or in a school or interschool activity; and (3) if so, whether that differentiation is unreasonable.

In this case, the Superintendent of Public Instruction reviewed the matter and issued a thoughtful 17-page final order explaining his conclusion that there is no evidence that the school district violated the statute. In brief, the superintendent reasoned that (1) there is no evidence that the *school district* is subjecting students to differential treatment; (2) any differential treatment that does occur takes place outside of any education program or service or a school or interschool activity; and (3) even if that were not the case, any differentiation in treatment that the school district conceivably has committed by mere association with the Boy Scouts is so brief and attenuated that it is not unreasonable under the circumstances.

The majority gives that final order short shrift and reverses the superintendent's decision. It essentially ignores the definition of "discrimination" set out in the statute, substitutes its own judgment for that of the superintendent, and concludes that the fact that the district permits the Boy Scouts to make presentations during school transforms that Boy Scout policy into unlawful school district discrimination.

In my view, the majority has strayed from the narrow task before it. The superintendent correctly concluded that there is no evidence that the school district subjects students to differential treatment. Even assuming for the sake of argument that the differentiation in treatment to which the statute refers includes the sort of differentiation by proxy that the majority concocts, it is undisputed that—and it bears some emphasis that this is a point that even petitioners concede—no differentiation in treatment occurred in any education program or service or a school or interschool activity. Thus, it is not even necessary in this case to evaluate whether any differentiation in treatment that occurred in this case was reasonable. The superintendent's order should be affirmed.

## I. THE REGULATORY BACKDROP

### A. *The relevant statute*

I begin with the wording of the statute, which I contend is so important in understanding the nature of the task before us. ORS 659.850(2) provides that

> "[n]o person in Oregon shall be subjected to discrimination in any public elementary, secondary or community college education program or service, school or interschool activity * * * where the program, service, school or activity is financed in whole or in part by moneys appropriated by the Legislative Assembly."

The statute defines the term "discrimination" to mean

> "any act that unreasonably differentiates treatment, intended or unintended, or any act that is fair in form but discriminatory in operation, either of which is based on age, disability, national origin, race, marital status, religion or sex."

ORS 659.850(1).

The statute was enacted in 1975, and its text parallels federal antidiscrimination legislation that Congress had enacted several years earlier. In fact, we have noted that the Oregon legislature intended that the statute—in particular, the definition of "discrimination"—track federal law. *See generally Montgomery v. Board of Education*, 188 Or App 63, 71-79, 71 P3d 94 (2003) (discussing relationship between state and federal antidiscrimination statutes and regulations). As a result, federal decisions sometimes are consulted in evaluating discrimination claims arising under the state statute; we have even instructed administrative agencies to consult federal law concerning the "reasonableness" component of the definition of "discrimination" in ORS 659.850(1). *Montgomery*, 188 Or App at 79. That fact becomes important in reviewing the superintendent's evaluation of the conduct at issue in this case.

Several things are worth noting about the statute. To begin with, it prohibits not all discrimination, but only discrimination that occurs "in any public elementary, secondary or community college education program or service, school or interschool activity." ORS 659.850(2). The operative word is "in." The term seems to me straightforward enough as it is used in the statute. It commonly is used as a term of limitation or location, usually in time or space. *Webster's*, for example, defines the term as, among other things:

> "**1a** (1) — used as a function word to indicate location or position in space or in some materially bounded object ‹ put the key ~ the lock › ‹ travel ~ Italy › ‹ play ~ the street › ‹ wounded ~ the leg › ‹read ~ bed › ‹ look up a quotation ~ a book › * * * **b** (1) — used as a function word to indicate position or location in something immaterial or intangible ‹ saw him ~ my dreams › ‹ position of the artist ~ society › or the fact of belonging to a group or association ‹you're ~ the army now › ‹ are you ~ the orchestra › (2) — used as a function word to indicate activity, occupation, or purpose ‹ advanced ~ hot pursuit › ‹ ~ search of lost treasure › * * * (3) — used as a function word to indicate a position or relationship of authority or responsibility ‹ ~ charge of the company's affairs › ‹ ~ command of the garrison › (4) : in the course of ‹ ~ cooling this material hardens › ‹ drowned ~ crossing the

river> (5) — used as a function word to indicate close connection by way of implication or active participation < ~ the plot > < ~ an amateur play > [.]"

*Webster's Third New Int'l Dictionary* 1139 (unabridged ed 2002). *Merriam-Webster's Collegiate Dictionary* 585 (10th ed 1999) similarly defines the term as "a function word to indicate inclusion, location, or position within limits < ~ the lake > < wounded ~ the leg > < ~ the summer >." *See also Marcilionis v. Farmers Ins. Co.*, 318 Or 640, 645-46, 871 P2d 470 (1994) ("Giving the words used in the statute * * * their natural, plain, and ordinary meaning, a person is 'in' the insured car when that person is completely or partially inside a portion of the car.").

Of course, dictionaries tell us only what words *can* mean, not necessarily what the legislature in fact intended them to mean. *State v. Holloway*, 138 Or App 260, 265, 908 P2d 324 (1995). What the legislature intended must be gleaned from the way words are used in the statutes. *Id.* In this case, the legislature employed the term with reference to a "public elementary, secondary or community college education program or service, school or interschool activity." ORS 659.850(2). What the statute prohibits is discrimination that occurs "in" such programs or activities. Thus, it appears that the legislature used the term in its ordinary sense, that is, as a function term to indicate limitation in terms of time, position, or location. Not all discrimination is prohibited, only discrimination that occurs "in" one of the listed programs or activities.

Next, the "discrimination" that must occur "in" an education program or service or "in" a school or interschool activity must occur in one of two ways. First, the statute defines "discrimination" as an "act that unreasonably differentiates treatment." ORS 659.850(1). Second, it also defines the term as "an act that is fair in form but discriminatory in operation." *Id.* I mention that because, as I understand this case, the parties debate only the application of the former definition of discrimination; no one has suggested that—and the majority does not address whether—the school district's conduct is "fair in form but discriminatory in operation."

Thus, the relevant portion of the statute in this case is the provision of ORS 659.850(1) that defines discrimination as an "act that unreasonably differentiates treatment." That means that there are three elements of the discrimination claim in this case. At the outset, there must be differentiation in treatment. If there is none, there is no discrimination within the meaning of the statute. If—and only if—there is differentiation in treatment, then, to qualify as "discrimination" under the statute, that differentiation must have occurred "in" an education program or service or "in" a school or interschool activity. If it did not, then there is no "discrimination" within the meaning of the statute. Finally, if—and only if—there is differentiation in treatment in an education program or service or in a school or interschool activity, that differentiation must be unreasonable. If it is not unreasonable, then there is no "discrimination" within the meaning of the statute.

B. *Applicable administrative rules*

The statute also authorizes the state Board of Education to adopt rules to ensure compliance with the prohibition against subjecting any person to discrimination within the meaning of the statute. ORS 659.850(3). The board has adopted such rules, and among them is OAR 581-021-0049, which sets out a procedure for resolving complaints of discrimination in violation of ORS 659.850(2).[1] A person complaining of such discrimination first is required to exhaust local grievance procedures, after which he or she may appeal in writing to the superintendent.[2] OAR 581-021-0049(1). The superintendent's role then is as follows:

---

[1] The board also has adopted rules that enumerate a number of "specific prohibitions," OAR 581-021-0045(3), but petitioners in this case have not contended that the activities in this case implicate any of them.

[2] The existence of that local grievance procedure raises an interesting question about the scope of the proceedings in this case. Petitioners initiated this proceeding by filing a complaint concerning a recruiting incident that occurred in 1996. They exhausted local government grievance procedures and then appealed to the superintendent. Before the superintendent, they complained about additional recruiting incidents and offered evidence concerning those additional incidents. It is uncontested that petitioners did not exhaust local government grievance procedures as to those additional incidents. In fact, the superintendent himself noted that point and concluded that—strictly speaking—he did not need to address the lawfulness of those incidents. In the event that a reviewing court were to disagree about that point, he addressed the lawfulness of those additional incidents.

"The Superintendent shall review the local school district procedures and findings of fact to determine if proper procedures were followed and what action if any shall be taken. In making this determination, the Superintendent may decide:

"(a) No substantial evidence exists for the charges of discrimination, and no further action will be taken;

"(b) Discrimination may exist, and conciliation will be attempted to reach agreement by both parties."

OAR 581-021-0049(1).

In other words, the superintendent must determine whether proper procedures were followed and what action, if any, is to be taken. In making that determination, the superintendent may take one of two courses. First, he or she may determine that no substantial evidence exists for the charges, in which case no further action is necessary. Second, he or she may determine that discrimination may exist—that is, that there is substantial evidence of discrimination—in which case the superintendent must engage in a conciliation process.

## II. REVIEW OF THE SUPERINTENDENT'S ORDER

As I have mentioned, the superintendent examined the findings of fact made by the school district, evaluated the evidence submitted by the parties, and concluded that there was no substantial evidence of discrimination. As a result, in accordance with the applicable administrative rule, he determined that no further action was necessary. In reaching the conclusion that there was no substantial evidence of discrimination, the superintendent addressed each of the three components of the statutory definition of "discrimination" in ORS 659.850(1), although he did not identify them as separate

---

In my view, it is at least debatable whether the lawfulness of the incidents that occurred after the filing of the complaint is justiciable. *See, e.g., Mullenaux v. Dept. of Revenue*, 293 Or 536, 539, 651 P2d 724 (1982) ("judicial review is only available after the procedure for relief within the administrative body itself has been followed without success"). Nevertheless, I think the point is academic. If I understand the arguments and issues correctly, the case essentially stands or falls on the lawfulness of the initial 1996 incident. The additional incidents and the evidence pertaining to them do not materially alter the nature of the issues raised by the initial incident that is the subject of the original complaint.

considerations. With the foregoing statutes and rules in mind, I turn to the proper review of the superintendent's findings and conclusions.

## A. *Differentiation in treatment*

The superintendent concluded that there was no evidence that the school district subjected any person to differential treatment. He noted that the Harvey Scott principal prepared a newsletter about the Boy Scouts that was "available to all students on a nondiscriminatory basis." He further noted that the informational presentations that occurred during school were "open to all students on a nondiscriminatory basis." He noted that, although the Boy Scouts may have a discriminatory membership policy, the fact remains that nothing that the school did subjected anyone to differentiation in treatment. In that regard, the superintendent referred to cases interpreting the federal law that forms the context for ORS 659.850 and that hold that a recipient of federal funds generally may be liable for violating the federal law counterpart "only for its own misconduct" and may be liable for the discriminatory acts of third parties in only very limited circumstances not present in this case.

As far as I can tell, the facts on which the superintendent relied are undisputed and entirely borne out by the evidence in the record; there is no evidence to the contrary. It seems clear that the school permitted representatives of the Boy Scouts to make presentations during the lunch period. The length of the presentations varied, usually lasting no more than a few minutes. Videotapes of several presentations show that the introductions of the Boy Scouts representatives by school personnel lasted from 15 to 90 seconds, followed by presentations by the Boy Scouts representatives themselves averaging around a minute. Afterward, the Boy Scouts representatives made themselves available to talk with students for up to a half hour. During the presentations, information about the Boy Scouts was distributed to interested children. No child was required to take any information. The wrist bracelets, for example, were given only to children who asked for them. There is no evidence that, during the presentation, anyone mentioned the policy of the Boy Scouts with respect to a belief in God. There is no evidence

that anyone mentioned religion at all. There is certainly no evidence that anyone told the children that only persons who believe in God may join the organization. To the contrary, the Boy Scouts representatives told the children that anyone could join.

Under the circumstances, it is difficult for me to understand how the superintendent erred in concluding that there is no evidence that the school district subjected students to differentiation in treatment. The evidence appears to be undisputed that the school district treated every child the same. I therefore would conclude that the superintendent did not err in determining that there was no evidence of differential treatment and end the matter.

The majority nevertheless concludes that the superintendent erred. The majority reasons that, even though the school district itself did nothing that differentiated treatment, the fact remains that the Boy Scouts does differentiate treatment by limiting their membership to those children who profess a belief in God. According to the majority, because of the extent to which "the district's actions connected it to the Scouts," the district, in effect, ratified the differentiation that may be committed by the Boy Scouts. 198 Or App at 40. The majority thus concludes that the school district engaged in differentiation in treatment by mere association with the Boy Scouts.

I find the majority's reasoning difficult to accept for several reasons. To begin with, the complaint in this case targets discrimination *by the school district*, not the Boy Scouts. Thus, the issue is whether the school district has committed an "act" that differentiates treatment between individuals on the basis of religion. The only "act" that the school district committed was to permit Boy Scouts representatives to make presentations to students, presentations in which they declared that membership in the organization was open to all students on a nondiscriminatory basis. Moreover, the majority's argument misses the point of the statute, which does not prohibit a school district from merely associating with an organization that discriminates.

Aside from that, the majority's conclusion that the school district's actions too closely identify the district with

the discrimination that the Boy Scouts practices is rather at odds with our previous analysis of essentially the same factual record in *Powell v. Bunn*, 185 Or App 334, 59 P3d 559 (2002), *rev den*, 336 Or 60 (2003) (*Powell I*). In *Powell I*, to be sure, the precise legal issue was different—involving the question whether the actions of the school district, in permitting the Boy Scouts to recruit during the school lunch period, amounted to a violation of the *constitutional* prohibition on state entanglement with religion.

But, doctrinal differences aside, the underlying issue was quite similar, namely, whether the policies of the Boy Scouts with respect to religion could be attributed to the school district. We answered the question in the negative. Among other things, we explained that the relationship between the Boy Scouts and the school district was too brief and minimal:

> "A Boy Scouts representative addresses the students for a limited purpose: to make the organization's existence known and to tell students (and their parents, via the students) how to learn more about the organization and join it. That is all. No religious message is conveyed; religion is not so much as mentioned. The students' exposure to that limited message is brief, consisting of a five-minute announcement in the school cafeteria. Also, the students voluntarily may receive printed information to * * * take home to their parents. That limited information is given to students once or, at most, twice in a full school year. *Such brief, neutral activity that conveys no religious message cannot sensibly be equated with governmental advancement of religious beliefs or principles.*"

*Id.* at 361 (emphasis added). As far as I can determine, the record in *Powell I* and the record in this case are not materially different. Thus, we are left to wonder why the same conduct can be characterized as "brief," "neutral," and "limited" in one case and characterized so differently in another.[3]

---

[3] I recognize that our standard of review in this case is different from the one that we applied in *Powell I*. Still, given what we said in *Powell I*—that the facts "cannot sensibly" be read any other way—it strikes me as at least odd that the majority does precisely that with no explanation beyond the unadorned conclusion that the cases "have little in common." 198 Or App at 39.

The majority also takes the superintendent to task for referring to federal case law. According to the majority in relying on those decisions, "the superintendent evaluated the district's action by the wrong standard." 198 Or App at 35-36. I suggest that the majority is being unnecessarily harsh. As I pointed out earlier in this opinion, we ourselves have observed on a number of occasions that the text of ORS 659.850 has its origins in federal statutes and regulations in a number of respects. Indeed, in *Montgomery*, we went so far as to instruct a school board that it "may find assistance from the extensive federal law" concerning the relevant portion of ORS 659.850. 188 Or App at 79. I would not be surprised if the superintendent were to feel a bit whipsawed by the contrary message the majority sends in this case.

The majority responds to my complaint with an extended discourse—indeed, the majority devotes more attention to this than to any other issue in the case—on the differences between federal and state law. 198 Or App at 35-39. With respect, the majority doth protest too much. All the superintendent did was note that *we* stated in *Aiken v. Lieuallen*, 39 Or App 779, 593 P2d 1243 (1979), that ORS 659.850 was enacted shortly after Congress enacted Title IX and that the regulations implementing ORS 659.850 "were modeled closely after the federal regulations" implementing Title IX. *Aiken*, 39 Or App at 781-82. The superintendent did not, as the majority suggests, substitute consideration of federal for state law. He simply referred to federal law "for guidance" in interpreting the state law, as often occurs in cases in which the federal law provides context for a state enactment. *See, e.g., Stevens v. Czerniak*, 336 Or 392, 401, 84 P3d 140 (2004) (Federal Rules of Civil Procedure may serve as context for construing Oregon counterparts); *State of Oregon DCS v. Anderson*, 189 Or App 162, 171, 74 P3d 1149, *rev den*, 336 Or 92 (2003) (federal child support legislation is context for state law); *Harris v. Pameco Corp.*, 170 Or App 164, 176, 12 P3d 524 (2000) (federal civil rights law is "instructive" in interpreting state law). I do not retreat from my observation that, upon reading the majority's opinion, the superintendent will likely—and, in my view, understandably—feel unfairly treated by this court.

B. *Differentiation in treatment "in" an education program or service or "in" a school or interschool activity*

The superintendent also noted that the record contained no evidence of discrimination "in" a school or school program or activity. The superintendent noted that, "[w]hile Boy Scout *membership* is apparently not open to all students, membership is not a public school program, service or activity." (Emphasis in original.) In my view, the superintendent was correct.

The majority, however, concludes that, because the Boy Scouts recruiting took place during school hours at a location where the students were required to be, and after a district representative told the students to be quiet so that they could listen to the presentation, the recruiting itself became a school activity. 198 Or App at 38. The problem is that, as I have noted, even under the majority's analysis, the recruiting presentation itself was not the "act" that constituted differential treatment that violates the statute. Everyone agrees that the recruiting presentation itself was neutral and contained no reference to religion at all, much less any mention of the Boy Scouts' discriminatory membership policy. To the contrary, the only evidence on the subject is that the Boy Scouts representatives told the students that anyone could join the organization. Thus, even assuming that the recruiting presentation of the Boy Scouts representatives constituted a school activity within the meaning of the statute, the fact remains that *that* is not the activity that is the basis for the discrimination claim. As the superintendent correctly observed, the only actual differential treatment— exclusion of atheists from membership—occurs outside of any school program or activity.

Interestingly, petitioners in this case concede that much. In their own words:

> "Petitioners admit that there is no evidence * * * that the Boy Scouts split the room into which students believe in God and which do not and then tell the non-believers [that] they cannot join. Instead, the Boy Scouts come into the schools and tell the young children that 'all boys grades one

through five can join' *and then discriminate against some of those boys at a future time.*"

(Emphasis added.) The statute does not, however, prohibit discrimination that occurs "at a future time." It prohibits discrimination that occurs "in" a school activity.

The majority acknowledges that, as I have noted, the word "in" commonly is used as a word of limitation with respect to space or time. In the blink of an eye, however, the majority then turns its back on the ordinary meaning of the term and suggests that it refers to something quite different. The majority begins by noting that, according to at least one of the dictionary definitions of the term, "in" also can "indicate close connection by way of implication or active participation." 198 Or App at 41. Armed with that snippet from the dictionary, the majority then suggests that the differentiation in treatment in this case occurred "in" school in the sense that "the precipitating conduct—Scout recruitment— occurred at school and in the course of a school activity, even though the ultimate impact of that conduct—the exclusion of Remington from membership in the Scouts—did not occur at the same place and time." *Id.* Thus, according to the majority, if an event occurs "in" a school activity (in its ordinary sense), and that event precipitates a chain of further events that ultimately produces discrimination, that discrimination occurs "in" a school activity (in the majority's broader sense) regardless of when or where the discrimination actually takes place, whether weeks or even months later.

I find the majority's proposed construction of the statute unpersuasive. To begin with, the majority relies on an acontextual use of definitions, which—as any lawyer knows—can be employed to make words mean anything.[4] Indeed, the majority's construction does not actually apply the dictionary definition that it cites. It takes several words used in the definition and employs them without reference to

---

[4] I am reminded of the story—probably apocryphal—about an English-Russian translation computer program that, working word by word, translated the King James Biblical passage "the spirit is willing, but the flesh is weak" from English to Russian and back into English. The resulting word-by-word translation was that "the vodka is fine but the meat is rotten." Ellen P. Aprill, *The Law of the Word: Dictionary Shopping in the Supreme Court*, 30 Ariz St LJ 275, 285 (1998).

the definitional context in which they are used. Thus, when *Webster's* notes that the term "in" may be employed to "indicate close connection by way of implication or active participation," *Webster's* at 1139, the majority rushes to conclude that the term may be employed to refer to any events that are causally "connected." In the process, the majority's construction produces a meaning of the statutory term that cannot be reconciled with *any* ordinary definition.[5] I have searched the wording of the statute in vain for any indication that the legislature intended that.

The majority's construction, in fact, subtly rewrites the statute. According to the majority, only "precipitating conduct" that later produces discrimination need occur in or during a school activity for the statute to apply. As long as that precipitating conduct occurs during a school activity, it does not matter when or where the resulting discrimination occurs. That construction ignores the fact that the legislature took the trouble to spell out that the statute applies only if *the discrimination itself*—not the event that precipitated it— occurs "in" a school program or activity. ORS 659.850(1).

Petitioners complain that adhering too closely to the wording of the statute would permit discriminatory organizations to "lie about their discrimination" with impunity. The majority similarly insists that giving the words of the statute their ordinary meanings "would foster almost endless loopholes" that would permit people who discriminate to evade the law by not being candid about their discrimination. 198 Or App at 41. Those are interesting policy arguments, but ones that should be addressed to the legislature. The fact remains that no differentiation in treatment occurred during a time or place to which the statute applies.

Petitioners also complain that they offered uncontradicted medical evidence that young children tend to think that any presentation that occurs at school is, in fact, a

---

[5] The dictionary itself offers examples—which the majority omits—to demonstrate the sense in which it refers to "close connection by way of implication or active participation": "‹ [in] the plot › ‹[in] an amateur play›." *Webster's* at 1139. With those examples in mind, it becomes clear that the majority's construction of the term "in" is foreign even to the dictionary definition on which it relies for support.

school-sponsored presentation. That, however, is merely a variation of the majority's contention that the school district should be regarded as having adopted or ratified the Boy Scouts presentation. As I have pointed out, even assuming that that is the case, the fact remains that the statute does not prohibit mere association with an organization that discriminates. It prohibits acts of differentiation in treatment "in" a school activity. The presentation that petitioners and the majority struggle so hard to associate with the school district simply did not treat students differently in any way.

In a similar vein, petitioners observe that there is evidence in the record that children "feel ostracized" when they learn that they cannot join the Boy Scouts because of their religious beliefs. Once again, however, the observation is beside the point. It is undisputed that the students were not informed of the Boy Scouts membership policies during any school program or activity. If they eventually felt ostracized, it was not because of any differentiation in treatment that occurred in school.

There is, in other words, no evidence that any act that occurred "in" school or during a school program or activity differentiated treatment among any persons. The only evidence was that any differentiation in treatment that occurred as a consequence of the Boy Scouts' membership policies occurred outside of school in a nonschool program. Consequently, ORS 659.850(2) simply does not apply.

## C. *Reasonableness of differentiation in treatment*

The statute also requires that, to constitute "discrimination," any differentiation in treatment must be "unreasonable." ORS 659.850(1). And, in this case, the superintendent concluded that—even assuming for the sake of argument that any differentiation in treatment occurred— such differentiation in treatment was not unreasonable. As I have noted, however, the record amply supports the superintendent's findings that there is no evidence of any differentiation in treatment that occurred in a school activity in the first place. It is therefore not necessary to evaluate the correctness of his alternative conclusion; the majority, in other words, errs in even reaching the issue.

In conclusion, the majority's opinion neglects to review the superintendent's order in terms of the specific components of "discrimination" that ORS 659.850(1) details. In my view, the superintendent correctly concluded that there is no evidence that the students were treated differently on the basis of religion. Our review of the superintendent's order properly should end there. Even assuming that there is evidence that the students were treated differently on the basis of religion, the fact remains that the superintendent correctly concluded that there is a complete absence of evidence—as petitioners themselves concede—that such treatment occurred "in" a school activity.

For the foregoing reasons, I would affirm the superintendent's order, and from the majority's opinion to the contrary, I respectfully dissent.

Edmonds and Haselton, JJ., join in this dissent.